Filed 5/20/16  P. v. Ali CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MOHAMMED HAROON ALI,<br><br>        Defendant and Appellant. | A136128<br><br>(San Mateo County<br>Super. Ct. No. SC046199A) |

Appellant Mohammed Haroon Ali, who is serving a prison sentence of 55 years to life, appeals from a first degree murder conviction (Pen. Code, § 187)[1] stemming from the strangulation death of his girlfriend in 1999.  The appeal is from Ali's second first degree murder conviction for the same offense, the judgment from his first trial having been vacated on a federal habeas petition.[2]  (28 U.S.C. § 2254; *Ali v. Hickman* (9th Cir. 2009) 584 F.3d 1174, 1196.)

---

[1] Undesignated statutory references are to the Penal Code.

[2] An information filed November 8, 1999, charged Ali with murder (§ 187) and alleged a prior conviction for kidnapping, which qualified him both for three-strikes sentencing (§§ 667, subd. (b), (d), 1170.12, subd. (c)(1)) and a five-year serious prior felony enhancement.  (§§ 667, subd. (a), 1192.7, subd. (c)(20).)   Ali was originally tried in 2001, convicted by a jury of first degree murder, and sentenced to 55 years to life in prison.  The conviction was affirmed on appeal to this court (No. A096034), but the Ninth Circuit later ordered a writ of habeas corpus conditionally granted on grounds the prosecutor violated the *Wheeler-Batson* rule.  (*Batson v. Kentucky* (1986) 476 U.S. 79; *People v. Wheeler* (1978) 22 Cal.3d 258; *Ali v. Hickman*, *supra*, 584 F.3d at p. 1196.)  On

1

Ali raises several issues from his retrial: (1) the jury was improperly instructed on felony murder in several respects; (2) the court abused its discretion in allowing mental health rebuttal testimony by a prosecution expert following a belated motion by the prosecutor to have his mental health expert examine Ali, thereby violating state law and due process; (3) the prosecutor committed misconduct both in his cross-examination of Ali and in his closing argument to the jury (and defense counsel was ineffective for failing to object); and (4) even if none of those errors standing alone would require reversal, their cumulative effect was prejudicial.  In supplemental briefing, Ali also claims the court erred in failing to give the jury a unanimity instruction sua sponte, which would have required the jurors to agree on whether Ali committed felony murder based on the snatching of his girlfriend's car keys during their argument or on the theft of her car after her death.

We conclude the jury was adequately instructed on felony murder principles, a unanimity instruction was not required, the prosecutorial misconduct claims were forfeited by failure to object, counsel was not ineffective, and the court did not abuse its discretion in ordering the mental health examination and admitting the rebuttal testimony. Because we find no error, we also find no cumulative prejudice.  Accordingly, we affirm the judgment.

## BACKGROUND

Trial commenced on December 8, 2011, and the jury was sworn on January 23, 2012.  The facts, recited in the light most favorable to the judgment (see *People v. McGehee* (2016) 246 Cal.App.4th 1190, 1195), may be summarized as follows.

### I.    The Prosecution's Case

Ali is an East Indian citizen of Fiji who, at the time of the crime, was 23 years old. In 1995, he had been convicted by plea of kidnapping his then-girlfriend, Daizy Chandra. As a result of that offense, he was placed on probation for five years with a suspended

remand, the federal district court vacated the murder conviction, and the state undertook to retry Ali.

2

prison sentence. Ali also faced possible deportation as a result of his conviction. One of the conditions of his probation was that he be tested for drugs. When he produced a drug test showing he had used a controlled substance he was ordered by the court to enter a drug rehabilitation program.

Thus, under compulsion, in the spring of 1997, Ali entered Project 90, a residential alcohol and drug recovery facility in San Mateo County. He graduated from Project 90 and became a volunteer house manager at one of its residential centers in 1998. In January 1999, he became a part-time employee with the youth and adolescent outreach program. Ali shared an office at Project 90's Friendship Hall, an all-purpose facility used for social events, group events, and 12-step meetings.

In early 1999 Tracey Biletnikoff was 20 years old and had also been battling substance abuse. Ali testified he met Biletnikoff in the summer of 1997 at the San Mateo Alano Club. They became romantically involved, and in the latter part of 1998 were still a couple, although their relationship was not exclusive. There was testimony that both Ali and Biletnikoff were having second thoughts about their relationship in early 1999 and each of them told friends they were considering breaking up with the other.

On Saturday, February 13, 1999, Ali went bar hopping in San Francisco with a friend from Project 90 and later met up with another Project 90 friend. Ali spent parts of Saturday night and Sunday morning partying with one or both friends in Redwood City and San Francisco. Ali not only drank alcohol and smoked crack cocaine, but used heroin for the first time.

On Monday morning, February 15, 1999, Biletnikoff (not yet knowing about Ali's relapse) had a conversation with Kelley Sanchez, her best friend, about her intent to break up with Ali the next time she saw him, which would be later that day.[3] In fact, Sanchez

___

[3] One of the District Attorney's factual theories of the crime was that Ali strangled Biletnikoff when she tried to break up with him that night. In November 2001, Ali told a prison counselor that he killed Biletnikoff when she tried to terminate their relationship. When cross-examined about that statement, Ali testified it was the counselor's theory and he just went along with it because he did not want to answer any more questions about the crime.

told law enforcement that one week earlier Biletnikoff said she had already broken up with Ali. Biletnikoff also complained to Sanchez and others that Ali too often asked to borrow her car.

Around 5:00 or 6:00 p.m. on February 15, Ali and Biletnikoff walked into Project 90's O'Toole Center in San Mateo together. Both looked upset. Ali confided to William Tucker, the resident manager, he had relapsed. Ali was worried about losing his job, being kicked out of Project 90, being found in violation of probation, going to prison, and possibly being deported. Biletnikoff appeared worried, depressed and angry about Ali's relapse. But the witnesses who saw them together also saw Biletnikoff and Ali behaving affectionately.

Biletnikoff told Tucker she was upset because Ali wanted to use her car. She was afraid to let him borrow it because she believed he would go back to San Francisco to get more drugs. While Ali stayed at Friendship Hall, Biletnikoff attended a meeting in Burlingame with other members of the Women's Recovery Association (WRA). Afterwards she drove to Friendship Hall with a good friend from the program. The two discussed Ali's relapse, his desire to borrow Biletnikoff's car that evening, and Biletnikoff's fear he wanted to get more drugs. Biletnikoff told her friend she was not going to let Ali use her car. After arriving at Friendship Hall, Biletnikoff also told other friends about Ali's relapse and her dilemma about letting him borrow her car. Her friends advised Biletnikoff against letting Ali use her car.

Paul Galindo arrived at Friendship Hall about 7:40 or 7:45 p.m., planning to chair a meeting at 8:00 p.m. He encountered Biletnikoff, who told him Ali had relapsed and was acting like an "ass." Galindo then found Ali in his office, looking dejected. When Galindo asked Ali what was going on, Ali began to cry and said he had relapsed. He did not want to lose his job and did not want to start the Project 90 program over again. Ali also told Galindo "he had hit [Biletnikoff] and he felt bad about it and he wanted to talk to her." Galindo went outside and told Biletnikoff Ali wanted to see her, and Biletnikoff went inside Friendship Hall. Exactly what transpired when she went into Ali's office is known only to Ali.

4

In a video recorded confession to Detectives Douglas Steiner and James Tanner of the San Mateo Sheriff's Office after his arrest, Ali said Biletnikoff had found him in his office a little before 8:00 p.m. He asked to borrow her car, but she refused. Biletnikoff was angry over Ali's relapse and they argued. Biletnikoff wanted Ali to start Project 90 over from the beginning, but Ali was adamant he would not do that.

Ali grabbed Biletnikoff's car keys out of her hand, and she hit him, once in the mouth and several times in the chest. Biletnikoff then blocked the doorway. Ali grabbed her hands to pull her out of the way, but she braced herself against the copier and said, "I'm not gonna let you go, asshole."

Biletnikoff brought up her ex-boyfriend, who had failed in recovery and gone back to using drugs. She said Ali was going to do the same thing. Being compared to her ex-boyfriend made Ali angry because "[t]he dude used to hit her and everything like that." Biletnikoff also told Ali there were winners and losers at Project 90 and he was among "the losers." Ali told the deputies Biletnikoff had also called him a "prick" and a "mother fucker."

Ali said he was not under the influence of alcohol or drugs at the time of the killing. He told the detectives he just wanted to get out of the room, but Biletnikoff continued to block the door. He grabbed her by the shoulders, but she held on to the table. Ali then grabbed her by the neck, telling her, "Get out of my way." Ali pressed hard and lifted Biletnikoff up in the air as he strangled her. He claimed Biletnikoff kept swinging at him, hitting him in the face. Ali continued: "I don't know what happened at that point. And it was just like she kept hitting me, and I didn't stop."

When he saw "white stuff coming out of her mouth" he let go of her and she fell to the floor. Her eyes were wide open and her tongue came out of her mouth. At that point, Ali said he knew Biletnikoff was dead. With Biletnikoff still on the ground, Ali grabbed a T-shirt from his desk and tightly knotted it around her neck. Ali denied pulling the ligature tight. He "just like tied it and . . . jumped over her."

Ali told the detectives he had not wanted to stay close to Biletnikoff's body, so he went down the hall to the bathroom, where he washed his hands. From there, Ali walked

5

"hella fast" to go get one of the Project 90 vans, for which he had a set of keys. He removed the light bulbs from inside the van so they would not turn on when he opened the van doors. He parked the van next to a back door near his office, returned to his office, picked up Biletnikoff, carried her to the front seat of the van, and drove off. He said he "never meant to kill her" and just wanted her to shut up. Ali said he loved Biletnikoff.

Ali told the detectives he had driven around for a while before deciding to dump Biletnikoff's body at Cañada College. But the testimony of other witnesses (and his own testimony at trial) showed he stopped off first at the home in San Mateo where he lived with his sister Khuseed Khan (Khuseed) and her husband, Mohammed Khan (Khan). He arrived home at approximately 9:00 p.m. on February 15. He testified at trial he had gone there to ask Khan's advice, but Khan and Khuseed were arguing, so he showered and changed his clothes, and then went to talk to his 18-year-old nephew, Mohammed Atik Sharif. Khan confirmed Ali had no cuts, bruises or any other kind of injury on his face.

According to Sharif,[4] Ali told him there had been an "accident" and Biletnikoff had died after he unintentionally struck her face with his hand or elbow. Sharif asked Ali where Biletnikoff was, and Ali said "right here" and pointed to a van parked nearby. Ali was scared and told Sharif he did not want to go back to jail. Sharif denied in his testimony that he knew what Ali's plans were, but Detective Steiner testified that Sharif told him during an interview that Ali told Sharif he was going to dump Biletnikoff's body at Cañada College and flee to Mexico. He asked Sharif for money, so they went in Sharif's car to an ATM, where Sharif withdrew $100 at 9:35 p.m. They then returned to the Khan home. Ali and Sharif arranged to meet later that night at a nearby Safeway, and Ali left in the van.

---

[4] Sharif was unavailable for trial, so his testimony from the first trial was read to the jury.

According to Ali's statement to the detectives, after driving the van to Cañada College, he "picked [Biletnikoff] up and put her on the ground," then searched her pants pockets for her keys, where she had put them. (This was inconsistent with his statement that he had grabbed the keys from her in his office, but he explained that she had put the keys back into her pocket.) Nevertheless, Ali said the keys somehow had ended up in her right sock, and he found them there after he removed her pants. He took the keys, threw the pants down the hillside, then rolled Biletnikoff's body down the hillside, too. Ali denied having hit or kicked her in the head before or during the time he strangled her. A search confirmed that Ali had no injuries on his body. Ali next returned the van to Friendship Hall and exchanged it for Biletnikoff's car.

Ali said it was then that he drove to his family's home in San Mateo where he showered, changed clothes, and asked his nephew Sharif for some money. He confirmed that he had obtained approximately $140 from Sharif, but denied telling Sharif he had killed Biletnikoff.

According to Sharif, he met Ali around 11:00 p.m. at the Crystal Springs Safeway, as planned. Ali then returned the van to Friendship Hall, with Sharif following in his car. Ali left the van and the two men drove in Sharif's car to an ATM, where Sharif withdrew an additional $60 to give to Ali. Sharif then drove Ali back to Friendship Hall where Ali took Biletnikoff's car. Sharif convinced Ali to talk to his sisters, Rauzana and Roshanara, and Ali and Sharif drove separately to the sisters' home in San Leandro, arriving around midnight.

Ali, crying, confided in his sisters and Rauzana's husband that he had accidently hit Biletnikoff with his elbow while trying to take her car keys after she refused to give them up. In a statement made later to the sheriff's detectives, Ali admitted going to San Leandro to tell Roshanara that Biletnikoff was dead. But, he told them: "I couldn't tell her that I choked her. I said, I told her that I hit her with my elbow." Ali also told his sister what he had done with Biletnikoff's body. At around midnight Roshanara called the Khans and told Khuseed what Ali had told her: there had been an accident involving Biletnikoff and she was dead.

Khan also spoke to Ali on the phone, and Ali told him the same story. Khan asked Ali how he knew Biletnikoff was dead, and Ali said "some white stuff came out of her mouth and her eyes bulged out." Ali told Khan he had "disposed of [Biletnikoff's body] over a cliff," but did not know which one. Ali later confirmed to the detectives having this conversation with Khan.

Khan advised Ali to turn himself in to the police and help them try to locate Biletnikoff in the hope that she might still be alive. Ali told the detectives that he told Khan he would turn himself in but later started planning "to go somewhere" with the money Sharif had given him. After they hung up, Khan called 911 and also spoke to the police early the next morning.

Back in San Leandro, Ali told his sister Rauzana he did not want to go to jail. As the San Leandro relatives were preparing to escort Ali to the Khans' home in San Mateo, Ali told Sharif he was not going there because he did not want to go back to jail. Instead, Ali headed south to Mexico.

Meanwhile, between 7:00 and 8:00 a.m. on February 16, 1999, Cañada College gardeners had found the partially-clad body of Biletnikoff on the hillside of one of school's parking lots. Biletnikoff was wearing only a sweatshirt and socks and her legs were spread apart. A pair of blue jeans lay nearby. Police responded to the area. A warrant soon issued for Ali's arrest and a bulletin issued for Biletnikoff's missing car.

An autopsy revealed Biletnikoff had suffered significant injuries to her neck due to ligature strangulation by a still-present and knotted black knit T-shirt wrapped tightly around her neck, plus manual strangulation, which the pathologist, Dr. Terri Haddix, opined had occurred before the ligature was applied. Dr. Haddix opined that Biletnikoff was alive when the ligature was applied. It typically takes three to five minutes to die from strangulation and oxygen deprivation, but a person could lose consciousness sooner. According to Dr. Haddix the presence of "white stuff" coming out of Biletnikoff's mouth indicated, not that she was dead, but that she was still trying to breathe.

Biletnikoff also had abrasions on her nose, lip, forehead, and upper chest, which were not related to the strangulation and were perimortem wounds, meaning they were

8

suffered just prior to or just after death, as well as injuries to her legs that were postmortem. The facial injuries were the result of blunt trauma.

Shortly after 8:00 p.m. on February 16, the authorities arrested Ali crossing the border from Mexico back into California after a customs agent recognized the license plate of Biletnikoff's car. When interrogated by San Mateo County Sheriff's detectives on February 17th, Ali denied having killed Biletnikoff throughout an interview that lasted several hours. Ali told the detectives he had disclosed his relapse to Biletnikoff on the 15th and she became angry. Ali was worried about being found in violation of his probation, going to prison, and being deported. Ali asked Biletnikoff if he could borrow her car because he wanted to leave for Mexico. Biletnikoff at first refused but eventually tossed or threw him her car keys. Ali recounted most of his movements on the night of the 15th fairly consistently with the chronology set forth above, but he continued to insist he had not harmed Biletnikoff and said she was alive and sitting on his desk when he left her. Ali admitted he had driven to Mexico in Biletnikoff's car but continued to deny any involvement in her death and said his family members were lying.

On February 18, 1999, the detectives again questioned Ali, and during this recorded interrogation Ali eventually confessed to killing Biletnikoff, as recounted above. Ali told the detectives he was going to tell them everything because that is what Biletnikoff had told him to do in a dream. The jury viewed a DVD recording of the interview.

The detectives brought Ali back to San Mateo later that evening and conducted another videotaped interview with him. During this short interview Ali reiterated finding Biletnikoff's keys in one of her socks as he prepared to leave her body at Cañada College and described how he dragged her body out of the back of the van and rolled Biletnikoff over the side of the cliff.

On February 19, 1999, Detective Steiner relayed to Dr. Haddix what Ali had said during the foregoing interviews because he was unsure whether Biletnikoff had been killed due to manual strangulation or ligature strangulation. According to Steiner, on

9

March 4, 1999, Dr. Haddix told him she could not say whether Biletnikoff had been killed manually or with the T-shirt. Dr. Haddix had no recollection of that conversation.

As indicated above, Ali was convicted in 1995 of kidnapping his then 19-year-old girlfriend, Daizy Chandra, with whom he had been involved since they were both 14 years old. Chandra testified under Evidence Code section 1109, confirming that Ali had attacked and abducted her when she ended their relationship two days before their scheduled wedding. On November 28, 1994, Ali pulled Chandra from a male friend's car, dragged her to his car, punched her repeatedly, broke her nose, and held her against her will for two nights.[5] Ali released her only after she said she would reconcile with him and would not press charges. As soon as Ali released Chandra she reported her abduction to the police.

On December 8, 1994, Ali broke down the door to Chandra's home, accosted her with a knife, and forced her out of the house and into his car, while she was clothed in just her pajamas. Ali said he was going to kill her and drove her to a secluded spot near Pescadero. Along the way Ali called Chandra names, told her she was going to die that day, waved the knife at her, punched her in the head and face, and held her in the car until she again promised to reconcile with him. Ali released Chandra, who reported her abduction to the police and testified against him at a preliminary hearing. In March 1995, Ali was convicted by plea of kidnapping Chandra on December 8, 1994, and admitted to using a knife during the course of the offense. He was placed on probation with a suspended prison sentence. The parties stipulated as follows: "The events of November 28th to November 30th, 1994, and of December 8th, 1994 regarding which witness Daizy Chandra testified to, did in fact occur." The prosecution rested on February 22, 2012.

## II. The Defense Case

The defense presented some lay witnesses, including Shayma Prasad, who was a friend of Ali's through Project 90 and the WRA. After Biletnikoff's death, Prasad visited

---

[5] Ali told the police that he had caught Chandra in bed with this friend a few days before the kidnapping, but Chandra denied this.

Ali in jail. Prasad asked Ali what had happened. Ali told Prasad that he and Biletnikoff had begun arguing in the back office at Friendship Hall. They argued over the fact that Ali wanted the keys to Biletnikoff's car. Biletnikoff said no and blocked the door to keep him from leaving because she did not want him to return to San Francisco and begin using drugs. Biletnikoff slapped Ali after he tried to push past her. Ali told Prasad he then went into a rage and killed Biletnikoff. Ali also confided to Prasad in 1998 that there was a woman in his life besides Biletnikoff. Her name was Melanie Oberg, and she was pregnant with Ali's child.

Oberg testified she met Ali in March 1998 while she was in drug recovery, and they soon began a romantic relationship. Ali told Oberg he and Biletnikoff were just friends. By June 1998, Oberg, who was 18 years old, was pregnant with Ali's child, and he told her "he would be there for [her]" no matter what decision she made regarding the baby. However, by September or October 1998, Ali had disappeared from Oberg's life. Oberg was hurt, disappointed, and angry. In early February 1999, Ali called Oberg "out of nowhere" and asked her to go to lunch so they could talk. Oberg declined. She gave birth to Ali's daughter shortly after Biletnikoff was killed.

The defense also presented the testimony of two medical professionals: Dr. Pablo Stewart and Dr. Warner Spitz. Dr. Stewart, a psychiatrist, testified about Ali's mental state at the time of Biletnikoff's death, opining that Ali had been suffering from bipolar disorder at that time. In preparation for his testimony Dr. Stewart reviewed numerous documents, including ten years of Ali's prison records containing mental health documentation, Ali's other medical and Project 90 records, and Ali's statements to the sheriff's detectives following his arrest. He also met with Ali for about 17 hours during 2010 and 2011 and interviewed a handful of people who had known Ali over the years.

Dr. Stewart opined that Ali suffered from "Bipolar II," a disorder characterized by periods of depression interspersed with periods of hypomania ("a period of elevated, expansive, or irritable mood that lasts for an extended period of time"). Ali was first diagnosed with a bipolar disorder in prison in 2002. Ali's prison records showed Ali had at times reported "experiencing psychotic symptoms, hearing voices, and being

11

paranoid." Dr. Stewart opined that Ali was in a manic phase of his disorder at the time of his February 1999 drug relapse, which resulted from substantial stressors, including Ali's probationary status, his immigration worries, the potential loss of his employment because of his substance abuse, his relationship with Oberg, and the ups and downs in his relationship with Biletnikoff .

Dr. Stewart testified that a person suffering from Bipolar II may experience "mental confusion or mental aberrations" that interfere with the ability to think clearly and control action. The illness is also consistent with someone already under internal stress and provoked by external stressors to lose control. Dr. Stewart concluded it was reasonably possible Ali was in the middle of a manic/hypomanic episode at the time of his deadly encounter with Biletnikoff. Ali's actions were consistent with someone who could not accurately perceive events.

Dr. Spitz, a medical doctor and forensic pathologist, disagreed with Dr. Haddix's conclusion that Biletnikoff had died as a result of ligature strangulation. Dr. Spitz opined the ligature played no role in Biletnikoff's death. He testified manual strangulation caused her death and the T-shirt had been placed around her neck after she was dead.

Ali testified on his own behalf at his second trial. He admitted he had relapsed on the weekend before Biletnikoff's death, including using heroin for the first time, claiming he just "wasn't thinking at that time." He used beer, cocaine, methamphetamine and heroin that Saturday night. Ali also admitted killing Biletnikoff and tried to explain the circumstances.

Biletnikoff had picked Ali up on the morning of February 15, 1999. They were planning to go look for a new car for him, as his had broken down on February 13. According to his testimony, he told Biletnikoff about his relapse with both alcohol and drugs as the two drove around in her car. Biletnikoff became angry, and they argued about whether he would need to start over again in Project 90. He did testify that he and Biletnikoff had sex in Central Park in San Mateo before going to Project 90, where he had agreed to confess his relapse to the others.

His account of events at Project 90 that evening corresponded generally with the testimony of other witnesses. In the course of the evening Ali got upset because Biletnikoff kept telling him he needed to start the program over. Feeling he wanted to "get loaded" again, Ali asked Biletnikoff if he could use her car to go to San Francisco, but she refused.

After talking with others at Project 90 about the possibilities of going to prison, losing his job, and having to start the program all over again, Ali felt depressed and decided to leave the facility. Before he left, though, Galindo walked into his office and they discussed his relapse. Galindo reminded Ali he was on probation and could be found in violation for his relapse, especially if he dropped out of the program. Ali had a drug test scheduled with his probation officer the next day and was worried that his relapse would be discovered. Galindo encouraged him to stay in the program.

After Galindo left, as Ali turned off his computer, Biletnikoff walked into his office. Ali again described their argument in terms fairly consistent with his statement to the detectives. Biletnikoff was angry and demanded to know whether Ali was going to remain in the program, and he said he would not. Biletnikoff had her car keys in her hand, and Ali again asked to borrow her car, but she refused. Ali then asked her to drop him off at his sister's house, but she again refused. Ali then grabbed the keys out of her hand.[6]

Ali became really angry when Biletnikoff compared him to her ex-boyfriend and called him a "loser." Ali told Biletnikoff, "that's why Melanie don't want me to do

---

[6] He testified that he grabbed the keys from Biletnikoff near the beginning of their argument in his office, and he admitted he still had those keys in his possession after he strangled Biletnikoff, as he left to get the van to transport her body. From the point at which he grabbed the keys, the argument was no longer about the car keys, but about Biletnikoff's insistence that Ali start over again with his recovery efforts, and later about Oberg. Ali testified that when he had told others the argument with Biletnikoff was over the car keys that "was accurate, but the keys had nothing to do with the rest of the argument." Ali admitted he had lied to the detectives when he told them Biletnikoff had hit him immediately after he took her car keys. She actually started hitting him two or three minutes later.

13

nothing with my child because I'm a loser." When Biletnikoff asked Ali what he was talking about, he told her about Oberg (whom Biletnikoff knew) being pregnant with his child. This really angered Biletnikoff, and she was upset that they had engaged in unprotected sex earlier in the day. The yelling between them "just got worse and worse" and Biletnikoff hit Ali a couple of times.

As their argument escalated, Ali felt he had to leave the room, so he pushed Biletnikoff away from him. She then blocked his access to the door. Ali placed his hands on Biletnikoff's shoulders and tried to pull her away from the door. Ali remembered only feeling anger at that point. Somehow Ali's hands ended up around Biletnikoff's neck, and the next thing he knew she was on the ground, dead, with white fluid coming out of her mouth. He could not remember how long his hands had been around her neck.

He described putting Biletnikoff's body into the Project 90 van and going to his sister Khuseed's home, hoping to ask Khan for help. Once there, Ali told Sharif he had killed Biletnikoff and asked him for money. After grabbing one of his black T-shirts from a pile of clothes, he headed for Cañada College with Biletnikoff in the van.

Ali planned to make it appear that Biletnikoff had been the victim of a sex crime in the hope of diverting suspicion away from himself. At Cañada College, Ali tied the T-shirt around Biletnikoff's neck as part of his staging of a sex crime, took her out of the van, and dragged her down the hill. Ali also removed Biletnikoff's jeans and threw them down the hillside as part of his sex-crime ruse.

According to Ali, after dumping Biletnikoff's body, he met Sharif at a San Mateo bank, obtained money from him, and they then drove in separate vehicles to Friendship Hall to look for more money in Ali's desk, when Ali spotted Biletnikoff's car in a nearby parking lot. That is when he decided to take her car. He and Sharif drove in separate cars to San Leandro, where Ali told his sisters he had accidentally killed Biletnikoff with his elbow in an argument that had started "over the keys."

Ali also spoke over the phone with Khan and told him he had accidentally struck Biletnikoff with his elbow and killed her. Khan wanted Ali to turn himself in to the

police, and Ali believed Khan was going to call the police, so he decided to run because he was scared to go to jail. He still had not decided where to go. He told Sharif and his sisters he was going to Canada to throw them off.

Ali ultimately fled to Mexico. Once there, he bought a bus ticket to Mexico City, planning to go visit a friend who lived there. But when he got on the bus, he envisioned Biletnikoff's face and decided he would return to the United States and turn himself in. He got off the bus and drove back to the border with the intention of turning himself in, but he was arrested at the border.

Thus, Ali's testimony was generally consistent with his earlier statement to the sheriff's detectives but differed in several respects, including that he had gone to the Khans' home immediately after killing Biletnikoff, before dumping her body. He had not told the deputies about his confession to Sharif, he testified, because he did not want to involve Sharif in the investigation. Second, he neglected to tell the detectives that he and Biletnikoff had argued in his office in part about his relationship with Oberg and her pregnancy. Again, he did not want to "drag her or my child into this." And third, he neglected to tell law enforcement he had staged the dump site to look like a sex-crime scene, explaining he was too ashamed to admit he had done that. Ali testified on cross-examination that the reason he had not disclosed the details of the crime to others in the time since the crime was that his attorney had told him "not to say nothing to nobody."

In addition to those omissions, Ali's trial testimony differed from his earlier statement to law enforcement in that he admitted he had grabbed Biletnikoff's car keys from her hand during their argument and kept them from that point forward, instead of finding them in her sock at the dump site, as he had told the detectives.[7] He also testified that he grabbed the black T-shirt from the pile of clothes at the Khans' home and tied it around Biletnikoff's neck in the parking lot at Cañada College, instead of taking it from his desk in his office and tying it around her neck there, as he had told the detectives. He

---

[7] Ali had also told this to the detectives in 1999, but he also told them she had taken the keys back and put them in her pocket, and that he later found them in Biletnikoff's sock.

said he had lied when he told the detectives he tied the T-shirt around her neck in his office. And, Ali testified, he did not form the intention to take Biletnikoff's car until after he dumped her body and decided to flee to Mexico.

In some ways Ali's testimony also contradicted the testimony of others. For instance, Ali's testimony that he had not decided to flee to Mexico until after he had dumped Biletnikoff's body and then went to see his sisters in San Leandro conflicted with Sharif's statement to Detective Steiner that Ali told him he was running away to Mexico during their initial conversation at the Khans' house. Ali also disputed Galindo's testimony that he said he had hit or slapped Biletnikoff prior to their argument in his office and testified definitively he had not, in fact, hit Biletnikoff prior to the fatal confrontation.

Ali testified he agreed with Chandra's testimony about the kidnappings and regretted his actions, but he claimed she exaggerated some of his conduct. He said they had hit each other from the beginning of their relationship, but he "got big and strong and . . . never stopped."

Ali also acknowledged his relationship with Nafiza Ahmed, who was Khan's 14- or 15-year-old cousin. He met Ahmed in late summer 1997 and became sexually involved with her in the fall. Ali was 22 and thought Ahmed was 18 years old, not 14 or 15. By April 1998, Ali wanted to marry Ahmed, but her family rejected Ali's marriage proposal. Ahmed's parents sent her back to Fiji for a time. She returned to the United States in January 1999, and again crossed paths with Ali at her high school. At the time of Biletnikoff's death, Ali was again involved with Ahmed and did not want to end the relationship.

According to Ali, sometime around March 1998, Biletnikoff left the Bay Area for San Diego. After Biletnikoff left, in about May 1998, Ali met Oberg, who was also in drug rehabilitation. Oberg became pregnant with Ali's child shortly after they met and a few months before Biletnikoff returned to the area. After Biletnikoff returned in approximately October 1998, Ali began to spend less time with Oberg and more time with Biletnikoff.

16

Starting in late 1998, and certainly by February 1999, Ali was feeling that perhaps Project 90 was no longer working for him and he was not sure he could continue to remain sober. He called Oberg a few days before Biletnikoff's death, hoping that seeing her and taking responsibility for his child could help him maintain his sobriety. When she refused to see or speak to him, Ali felt "bummed out."

Ali admitted he did not tell the detectives the truth when he first talked with them, but rather "mixed the truth and lies" because he was scared. In the second interview, he told them the truth, except for the omissions and discrepancies noted, after having a dream about Biletnikoff in which she told him to tell the truth. Ali testified he loved Biletnikoff. He did not know "exactly what happened" and could not explain why he killed Biletnikoff. The defense rested on March 5, 2012.

## III. The Prosecution's Rebuttal

Dr. James Missett, a psychiatrist and an expert in forensic and addiction psychiatry, reviewed numerous documents, including prison records related to Ali. He witnessed the testimony of Dr. Stewart and much of Ali's testimony, and he conducted a three- to four-hour interview of Ali. He testified the prison records, more than once, referenced an antisocial personality diagnosis for Ali. Dr. Missett disagreed with Dr. Stewart's opinion that it was reasonably possible Ali was suffering from Bipolar II disorder in February 1999.

Dr. Missett continued: "if there were any condition whatsoever that was of a mental or emotional nature, it would appear far more to deserve the title of a substance-induced whatever; depressive disorder; a substance-induced mental disorder; and so on." Dr. Missett insisted that Ali could only properly be diagnosed with a bipolar disorder if his "mental or emotional condition [had] not come about as a result of substance abuse or substance use."

In Dr. Missett's opinion Ali was not in the midst of a manic or hypomanic episode when he strangled Biletnikoff. Dr. Missett believed that Ali presently suffered from some sort of adjustment disorder, with bouts of anxiety and depression. "In four hours—in a four-hour period, the only thing I can say with absolute certainty as to the way Mr.

17

Ali was when I saw him and by no means was he in any way bipolar." Dr. Missett felt that during the interview Ali made statements at odds with what he had told other interviewers, and his new claims "were totally self-serving and not in the service of veracity."

Dr. Missett relied heavily on the fact that Ali had a vivid memory of what occurred both before and after he strangled Biletnikoff, but not during the actual killing: "I've seen 15,000 people in my career. I've seen somewhere between 1,000 and 2,000 people who have either killed other people or made serious attempts to kill other people. The one thing that does not apply to any of those 1,000 or 2,000 people is everything went blank. I have no memory of it. The memory was excellent. The memory is excellent and his description of what he did before and after the killing is an indication that during the period of the killing, his memory was just as good, but he's not going to say that. What he says is 'I don't know what happened.' He knows."

According to Dr. Missett, a person who suffers from Bipolar II disorder can still function without losing clarity of thought. He might suffer from a distortion of time and place to a minimal degree, but he would not suffer a distortion of reality and would not fail to comprehend the consequences of his actions.

## IV. The Defense Surrebuttal

According to Dr. Stewart, a person's use of drugs does not preclude a mood disorder diagnosis. His diagnosis of Ali was based on the totality of evidence, including the approximately 20 months Ali was sober while at Project 90. Dr. Stewart criticized Dr. Missett's interview technique because he did not ask Ali about his mood states at all and instead concentrated on asking about details of the killing. Dr. Stewart also disagreed with Dr. Missett's suggestion that Ali had an antisocial personality disorder because there was nothing in the record to show Ali met those diagnostic criteria.

## V. The Verdict and Sentence

After the close of evidence, the jury was instructed on first degree murder, second degree murder, and voluntary manslaughter. With respect to first degree murder, it was

18

instructed on both (1) willful, premeditated, deliberate murder and (2) felony murder based on robbery or attempted robbery.

The jury deliberated about a day and a half before reaching its verdict. On March 15, 2012, the jury convicted Ali of first degree murder for the second time. (§ 187.) In a bifurcated bench trial, the court found true the allegation that Ali had a prior serious felony conviction (§ 667, subd. (a)) that also constituted a strike prior (§§ 667, subds. (b)–(j), 1170.12). The trial court sentenced Ali to state prison for 55 years to life on June 14, 2012, calculated by doubling the 25-year base term for first degree murder (§§ 667, subd. (e)(1), 1170.12, subd. (c)(1), 190, subd. (a)) and adding five years for the serious felony prior. Ali timely appealed.

## DISCUSSION

### I.  Jury Instructions on Felony Murder

#### A.  *Ali's Contentions and the Standard of Review*

Ali contends the trial court violated his rights to due process and a fair trial by failing to appropriately and accurately instruct the jury on the prosecution's felony-murder theory of first degree murder, which he characterizes as federal constitutional error requiring reversal. Ali puts forth several arguments about why the instructions were erroneous or incomplete. First, he requested and was denied a pinpoint instruction on the degree of force necessary for robbery. Second, he contends the court failed to instruct the jury on the necessity of the union or joint operation of act and specific intent with respect to robbery, an instruction he claims was required sua sponte. (CALCRIM No. 251.) Third, the court gave the jury a continuous transaction instruction that he argues was inapplicable to the facts of the case and has since been withdrawn from CALCRIM. And fourth, he claims in supplemental briefing that a unanimity instruction was required to ensure the jury would unanimously agree that the underlying robbery was either of Biletnikoff's keys or her car.

Ali contends the combined effect of the instructions given and the pinpoint instruction refused "caused the jury to either misapply or misconstrue the force element

19

of robbery, the intent with which the taking must occur, whether the killing was done in the course of a robbery, and/or whether it occurred because of a highly charged emotional argument over personal and relationship matters." Underlying Ali's claims is the premise that he did not have the intent required for robbery when he grabbed Biletnikoff's car key or manually strangled her because he intended at most to borrow Biletnikoff's car, not to deprive her of it permanently.[8] Ali's own testimony was that he decided to take Biletnikoff's car and run away to Mexico only after she was dead and he had dumped her body.

In reviewing a claim of instructional error, we consider the entire charge and do "not judge a single jury instruction in artificial isolation out of the context of the charge and the entire trial record." (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 276.) Where, as here, a defendant claims instructions are deficient, "[w]hat is crucial . . . is the meaning that the instructions *communicated to the jury*. If that meaning was not objectionable, the instructions cannot be deemed erroneous." (*People v. Benson* (1990) 52 Cal.3d 754, 801 (*Benson*).) We also consider the arguments of counsel in assessing the probable impact of the instructions on the jury. (*People v. Young* (2005) 34 Cal.4th 1149, 1202.) Thus, the ultimate question is "whether there is a 'reasonable likelihood' that the jury misconstrued or misapplied the law in light of the instructions given, the entire record of [the] trial, and the arguments of counsel." (*People v. Dieguez, supra*, at pp. 276–277.) "Whether or not the trial court should have given a 'particular instruction in any particular case entails the resolution of a mixed question of law and fact,' which is 'predominately legal.' " (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 568.) Ali's claim is therefore subject to de novo review. (*Ibid.*)

---

[8] Throughout this opinion we will use "intent to permanently deprive" as a shorthand description of the intent required for robbery. We recognize the intent requirement may also be satisfied by the intent to withhold another's property " 'for so long a time period that a substantial portion of its economic value or usefulness or enjoyment is lost.' " (*People v. Bacon* (2010) 50 Cal.4th 1082, 1117; accord, *People v. Aguilera* (2016) 244 Cal.App.4th 489, 500.) We use a shorthand formulation for ease of reference.

B.    *The Instructions Given*

At the jury instruction conference, defense counsel objected to the trial court instructing at all on felony murder, asserting the evidence did not support such a theory. The trial court overruled that objection, and eventually instructed the jury that the People were prosecuting Ali for murder under two theories: "malice aforethought, and . . . felony murder."  (CALCRIM No. 548.)

With respect to felony murder, the court gave the jury the version of CALCRIM No. 540A in effect at the time of trial:  "The defendant is charged in Count 1 with murder under a theory of felony murder.  To prove that the defendant is guilty of first degree murder under this theory, the People must prove that; one, the defendant committed or attempted to commit robbery; two, the defendant intended to commit robbery; and three, while committing or attempting to commit robbery, the defendant caused the death of another person.  [¶]  A person may be guilty of felony murder even if the killing was unintentional, accidental, or negligent.  To decide whether the defendant committed or attempted to commit robbery, please refer to the separate instructions that I will give you on that crime.  You must apply those instructions when you decide whether the People have proved first degree murder under a theory of felony murder.  [¶]  The defendant must have intended to commit the felony of robbery before or at the time that he caused the death.  It is not required that the person die immediately as long as the cause of death and the felony are part of one continuous transaction."[9]

The court also gave the jury separate instructions on robbery:  "Robbery is defined as follows: one, the perpetrator took property that was not his own; two, the property was taken from another person's possession and immediate presence; three, the property was taken against that person's will; four, the perpetrator used force or fear to take the property or to prevent the person from resisting; and five, when the perpetrator used force

_____

[9]  CALCRIM No. 540A now includes bracketed language on the escape rule as an optional part of the instruction.  The last sentence says the cause of death must occur "while the defendant was committing the felony."  Ali does not claim error on appeal based on the difference in language in the instruction his jury was given.

21

or fear to take the property, he intended to deprive the owner of it permanently or to remove it from the owner's possession for so extended a period of time that the owner would be deprived of a major portion of the value or enjoyment of the property. [¶] The perpetrator's intent to take the property must have been formed before or during the time he used force or fear. If the perpetrator did not form this required intent until after using the force or fear, then he did not commit robbery. A person takes something when he gains possession of it and moves it some distance. The distance moved may be short. The property taken can be of any value, however slight. Two or more people may possess something at the same time. A person does not have to actually hold or touch something to possess it. It is enough if the person has control over it or the right to control it either personally or through another person. [¶] Fear as used here means fear of injury to the person himself or immediate injury to someone else present during the incident or to that person's property. Property is within a person's immediate presence if it is sufficiently within her physical control that she could keep possession of it if not prevented by force or fear. [¶] An act is done against a person's will if that person does not consent to the act. In order to consent, a person must act freely and voluntarily and know the nature of the act. (CALCRIM No. 1600.)

Next, the court instructed the jury with former CALCRIM No. 549 on the "one continuous transaction" rule:[10] "In order for the People to prove that the defendant is guilty of murder under a theory of felony murder, the People must prove that the robbery or attempted robbery and the acts causing the death were part of one continuous transaction. The continuous transaction may occur over a period of time and in more than one location. In deciding whether the act causing the death and the felony were part of one continuous transaction, you may consider the following factors: one, whether the felony and the fatal act occurred at the same place; two, the time period, if any, between the felony and the fatal act; three, whether the fatal act was committed for the purpose of

_____

[10] Under CALCRIM No. 540A, the jurors were separately informed of the significance to felony murder of finding "one continuous transaction," as noted above.

22

aiding the commission of the felony or escape after the felony; four, whether the fatal act occurred while the perpetrator continued to exercise control over the person who was the target of the felony; five, whether the fatal act occurred while the perpetrator was fleeing from the scene of the felony or otherwise trying to prevent the discovery or reporting of the crime; six, whether the felony was the direct cause of the death; and seven, whether the death was a natural and probable consequence of the felony. [¶] It is not required that the People prove any one of these factors or any particular combination of these factors. The factors are given to assist you in deciding whether the fatal act and the felony were part of one continuous transaction."

The last instruction related to felony murder, a non-CALCRIM instruction requested by the defense: "To prove the felony murder theory of first degree murder, the prosecution must prove beyond a reasonable doubt that the crime of robbery was done for the purpose of committing the robbery rather than for the purpose of committing the homicide. If the defendant's primary purpose was to kill or if he committed the robbery to facilitate or conceal the homicide, then there was no independent purpose to commit robbery. If from all the evidence you have a reasonable doubt that the defendant had the independent purpose to commit a robbery, then you must find the defendant not guilty on the felony murder theory."

   C.   *Requested Pinpoint Modification of CALCRIM No. 1600*

In the trial court Ali sought to modify the standard robbery instruction, CALCRIM No. 1600, asking the court to add this language: "The force required for robbery must be more than the incidental touching necessary to take property." (*People v. Garcia* (1996) 45 Cal.App.4th 1242, 1246, disapproved on other grounds in *People v. Mosby* (2004) 33 Cal.4th 353, 365, fns. 2, 3.) Ali contends the language was necessary so the jury would not conclude that Ali used force sufficient for a robbery even if he "mere[ly] snatch[ed]" Biletnikoff's car keys from her. The trial court refused defense counsel's proposed modification, saying, "The court's view is that . . . I don't like to change or add to CALCRIM unless there's something that's not covered by CALCRIM or something that you can't easily argue."

23

Ali calls the court's ruling an erroneous and prejudicial refusal of an appropriate pinpoint instruction. "A defendant is entitled to a pinpoint instruction, upon request, only when appropriate. [Citation.] 'Such instructions relate particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case . . . .' " (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824.) However, the "trial court need not give a pinpoint instruction if it is argumentative [citation], merely duplicates other instructions [citation], or is not supported by substantial evidence [citation]." (*People v. Bolden* (2002) 29 Cal.4th 515, 558.) We do not deem the requested modification to be argumentative or unsupported by the evidence, but we do think it was somewhat duplicative.

CALCRIM No. 1600 makes clear that "force or fear" was required, and that implies more was necessary than an incidental touching. "It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions." (*People v. Gonzales* (2011) 51 Cal.4th 894, 940.) The word "force" is common enough to be understood by a jury. (*People v. Anderson* (1966) 64 Cal.2d 633, 640.)

Even more to the point, we find any instructional omission on this point to have been harmless beyond a reasonable doubt in light of the arguments of counsel. During closing argument both counsel made clear to the jurors that they could only find Ali committed robbery if he used force greater than the incidental touching necessary to take Biletnikoff's keys. The District Attorney stated: "The force or fear used to take the property or to prevent the victim from resisting. There has to be force or fear. It can't be I'm not paying any attention and somebody reaches into my pocket, grabbed my wallet, and took off on that."

Defense counsel made the same point even more clearly tied to the facts before the jury: "Snatching your girlfriend's keys so you can drive her car when you've done it countless times before and she's driven your car countless times before simply is not a robbery. . . . [¶] . . . [T]he way Mr. Ali explained it, there's been no evidence to the contrary, is that he didn't use force to do so. Snatching something out of someone's hands is not sufficient force to commit a robbery. The law is incidental touching, which

24

the Judge will explain to you if you have any doubts, is not sufficient force for a taking, even if it is done with the intent to permanently deprive someone of it." Defense counsel repeated the point with crystal clarity: "As I said before, you have to use force or fear. Force is more than incidental in terms of the touching."

The District Attorney expressly agreed: "And when you get other points made to you such as, you know what, incidental touching doesn't qualify. I agree." The District Attorney insisted, however, that the force Ali used to get Biletnikoff to stop blocking his exit (including the strangulation) was sufficient force.

We find no reasonable likelihood the jury believed it could find robbery based only on the incidental touching by Ali while snatching Biletnikoff's car keys from her hand. Both attorneys expressly repudiated such a legal theory. Any assumed error in denying a pinpoint instruction was therefore harmless under any standard.

   D.    *Omission of CALCRIM No. 251 Tailored to Apply to Robbery*

As his second claim of instructional error, Ali notes, while the trial court instructed the jury there must be "proof of the union, or joint operation, of act and wrongful intent" as to the murder charge, it failed to give the same instruction relating to the underlying felony of robbery. (CALCRIM No. 251.)[11] He claims the absence of this instruction potentially affected the jury's verdict by (1) "entic[ing] the jury to find Ali guilty of murder because he ultimately took [Biletnikoff's] car to Mexico after she was dead"; and (2) allowing the jury to "return[] a guilty verdict based on robbery murder even though they believed that [Biletnikoff] was killed for a reason unrelated to any taking." He further argues the giving of CALCRIM No. 3428 exacerbated the problem because it specified that any mental impairment the jury might find on Ali's part could

---

[11] CALCRIM No. 251, as given in this case, read as follows: "The crime charged in this case requires proof of the union, or joint operation, of act and wrongful intent. [¶] For you to find a person guilty of the crime in this case of first degree murder or the lesser included crime of second degree murder and/or voluntary manslaughter, that person must not only intentionally commit the prohibited act, but must do so with a specific intent and/or mental state. The act and the specific intent and/or mental state required are explained in the instruction for that crime."

have prevented him from forming a specific intent, but it only listed the types of specific intent relevant to murder: premeditation, deliberation and express or implied malice. It did not instruct that his mental illness could negate his formation of the specific intent to permanently deprive a property possessor of her property. This, he concludes, could have led the jury to convict him of first degree murder on a felony murder theory even though he never formed the intent to permanently deprive due to his mental illness.

We agree the instructions left the jurors free to convict Ali of first degree murder even if they believed he took Biletnikoff's car after he killed her, or if they believed he killed her for reasons unrelated to any intent to deprive, but we disagree the instructions left this route open under a felony murder theory without finding a joint operation of act and intent in connection with the underlying robbery. The instructions, taken together, made clear to the jury that if it concluded Ali did not have an intent to permanently deprive Biletnikoff of her property when he applied force to get past her and out of his office―for instance, if he formed the intent to take her car only after she was dead and he decided to flee to Mexico, as he testified—then he was not guilty of robbery and did not commit a felony murder. Of course, they remained free to convict him of first degree murder on a theory of premeditation and deliberation. (See *People v. Hernandez* (1988) 47 Cal.3d 315, 349 [manual strangulation is at least indicative of a deliberate intent to kill].) As quoted above, the jurors were instructed if they concluded Ali's primary purpose was to kill Biletnikoff, not to steal her keys or car, he was not guilty of felony murder.

The same information that would have been imparted by CALCRIM No. 251 was communicated to the jury in different instructions. The jury was specifically told as part of the general robbery instruction (CALCRIM No. 1600): "The perpetrator's intent to take the property must have been formed before or during the time he used force or fear. If the perpetrator did not form this required intent until after using the force or fear, then he did not commit robbery." The court also instructed the jury that this theory required that Ali "must have intended to commit the felony of robbery before or at the time that he caused the death." (CALCRIM No. 540A.) The court told the jury it must find, among

26

other elements of robbery, that Ali used "force or fear to take the property or to prevent the person from resisting," and at the same time Ali "used force or fear to take the property, he intended to deprive the owner of it permanently or to remove it from the owner's possession for so extended a period of time that the owner would be deprived of a major portion of the value or enjoyment of the property." (CALCRIM No. 1600.)

We fail to see, in light of the foregoing instructions, how the jurors could have been misled by the omission of CALCRIM No. 251 with respect to robbery. As the record does not affirmatively demonstrate otherwise, we presume the jurors were able to correlate the instructions and upon doing so followed them. (See *People v. Sanchez* (2001) 26 Cal.4th 834, 852.) As instructed, jurors could not have found Ali guilty on a felony murder theory if they believed Ali only decided to steal Biletnikoff's car after he killed her for unrelated reasons.

E.    *Former CALCRIM No. 549*

As a third claim of instructional error, Ali complains the court erroneously instructed the jury with former CALCRIM No. 549, the continuous transaction instruction for felony murder. We begin our analysis of this claim of error with a brief review of the genesis of former CALCRIM No. 549. This pattern instruction, it turns out, had a relatively brief lifespan, while the continuous transaction doctrine itself has a long and venerable history. (See *People v. Huynh* (2012) 212 Cal.App.4th 285, 307, fn.12.) Historically, the continuous transaction doctrine evolved as a way to describe the application of the felony murder statute in cases where felony murder liability aggravates the culpability of a single felon-killer. (See, e.g., *People v. Miller* (1898) 121 Cal. 343, 345.) In such a case, " 'There is no requirement of a strict "causal" [citation] or "temporal" [citation] relationship between the "felony" and the "murder." ' " (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1141.) "Section 189's requirement that a killing be 'committed in the perpetration of' the underlying felony is satisfied as long as the two crimes ' " 'are parts of one continuous transaction.' " ' " (*People v. Fiore* (2014) 227 Cal.App.4th 1362, 1379.)

27

Still, in the case of a sole robber, as here, exposure to felony-murder liability continues only until the robber has reached a place of temporary safety. (*People v. Stankewitz* (1990) 51 Cal.3d 72, 101; *People v. Fields* (1983) 35 Cal.3d 329, 365–368; *People v. Carter* (1993) 19 Cal.App.4th 1236, 1251–1253; accord, CALJIC No. 8.21.1.) This limitation on felony murder liability arises from what has come to be called the "escape rule." Under the escape rule, a killing committed by a felon during his or her flight from the scene of the underlying felony, and before reaching a place of temporary safety, is within the scope of the felony-murder statute. (*People v. Wilkins* (2013) 56 Cal.4th 333, 341 (*Wilkins*).) The escape rule serves to establish the " 'outer limits of the "continuous-transaction" theory.' " (*Id.* at p. 345, quoting *People v. Portillo* (2003) 107 Cal.App.4th 834, 846.) Thus, the continuous transaction doctrine and the escape rule are not mutually exclusive or contradictory. Rather, they work together to define the temporal scope of felony-murder liability.

The pattern instruction in question, former CALCRIM No. 549, came into being in 2006 in response to the Supreme Court's decision in *People v. Cavitt* (2004) 33 Cal.4th 187, 193 (*Cavitt*), and it was withdrawn from CALCRIM in 2013 based on that court's later decision in *Wilkins*, *supra*, 56 Cal.4th 333. *Cavitt* involved the application of the felony-murder rule to two defendants who claimed that their accomplice, a third defendant, was the killer. There, three teens, including a young woman, Mianta, agreed together to stage a break-in of Mianta's house and to rob Mianta's stepmother of jewelry and other valuables she kept in her home. (*Cavitt*, *supra*, 33 Cal.4th at p. 193.) After staging the break-in and beating the stepmother, the two boys hog-tied the stepmother, put a sheet over her head, and left her face down on her bed. After stealing the jewelry and other items, the boys fled, leaving Mianta alone with her stepmother, who suffocated. (*Ibid.*) At trial the boys' defense included a theory that Mianta, who had long harbored a grudge against her stepmother, intentionally asphyxiated the woman for personal reasons unrelated to the burglary-robbery after the boys had left the home with the jewelry and had reached a temporary place of safety. (*Id.* at pp. 193–194.) Thus, in *Cavitt*, the continuous transaction doctrine arose *in the specific context of the complicity aspect of*

28

*felony-murder liability*, not the aggravated culpability aspect. (See Robinson, *Imputed Criminal Liability* (1984) 93 Yale L.J. 609, 618, fn. 25 [distinguishing "aggravation of culpability" aspect of felony-murder rule from "complicity aspect" for felon nonkiller].)

Addressing felony-murder liability for claimed nonkiller felons in that context, the Supreme Court held in *Cavitt* that "the felony-murder rule requires both a *causal* relationship and a *temporal* relationship between the underlying felony and the act resulting in death. The causal relationship is established by proof of a logical nexus, beyond mere coincidence of time and place, between the homicidal act and the underlying felony the nonkiller committed or attempted to commit. The temporal relationship is established by proof the felony and the homicidal act were part of one continuous transaction." (*Cavitt*, *supra*, 33 Cal.4th at p. 193.) Former CALCRIM No. 549, which appears to have been an adaptation of a specially-drafted instruction that had been given in *Cavitt* (see 33 Cal.4th at p. 206, fn. 7) was published in the wake of the Supreme Court's decision in *Cavitt*. The CALCRIM Bench Notes explained that *Cavitt* does not impose a " 'sua sponte duty to clarify the principles of the requisite relationship between the felony and the homicide without regard to whether the evidence supports such an instruction.' " (Former CALCRIM No. 549 (Jan. 2006 new), quoting *Cavitt*, *supra*, at p. 204.) The Bench Notes further explained, however, "If the evidence raises an issue of whether the felony and the homicide were part of one continuous transaction, give this instruction." Former CALCRIM No. 549 remained in publication until 2013, when *Wilkins* was decided.

Compared to *Cavitt*, *Wilkins* presented a much more straight-forward application of the felony murder rule, where the central issue was a sole felon's culpability for a homicide. The defendant there was prosecuted for felony murder after a stove fell off the back of his pickup truck while he was driving on a four-lane highway, causing a fatal traffic accident. (*Wilkins*, *supra*, at pp. 338–339.) He had stolen the appliance while burglarizing a partially constructed home an hour earlier, some 62 miles distant, and the evidence presented an issue regarding whether or not he had reached a place of temporary safety before the death-causing act occurred. If he had, the felony would have been

29

deemed complete, and he could not have been convicted under a felony-murder theory. (*Id.* at pp. 347–348.)

But in *Wilkins*, the problem was not that giving CALCRIM No. 549, in and of itself, was erroneous, but that a clarifying "escape rule" instruction should have been given in addition.[12] (*Wilkins, supra,* 56 Cal.4th at p. 349 [CALCRIM No. 549 was, "in absence of an instruction on the escape rule—incomplete and misleading"].) The Supreme Court found the giving of CALCRIM No. 549 to be reversible error in that case because, without an "escape rule" instruction, even a juror who believed Wilkins had reached a place of temporary safety before the fatal act occurred would have had no reason to conclude he or she must find the defendant not guilty of first degree murder. (*Id.* at pp. 347-348.) The court found the error prejudicial under either *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) or *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*), there being a reasonable probability a jury properly instructed on the escape rule would have concluded that Wilkins had reached a place of temporary safety before the fatal act occurred and was not guilty of felony murder. (*Wilkins*, *supra*, at pp. 349–351.) Thus, by our reading, *Wilkins* merely reconfirmed the importance of the escape rule in the context of felony murder as applied in a single perpetrator case; it did not

---

[12] The trial court in *Wilkins* had used former CALCRIM No. 549 to instruct on the continuous transaction doctrine, but ruled that an additional instruction under CALCRIM No. 3261 was not appropriate based on the CALCRIM Bench Notes and *Cavitt*'s apparent suggestion that the escape rule has application only for other "ancillary consequences" of the felony, not for purposes of limiting the felony-murder rule. *Cavitt* described the continuous transaction doctrine and the escape rule as "two related, but distinct, doctrines." (*Cavitt, supra,* 33 Cal.4th at p. 208.) "The 'escape rule' defines the duration of the underlying felony, in the context of certain ancillary consequences of the felony [citation], by deeming the felony to continue until the felon has reached a place of temporary safety. [Citation.] The continuous-transaction doctrine, on the other hand, defines the duration of *felony-murder* liability, which may extend beyond the termination of the felony itself, provided that the felony and the act resulting in death constitute one continuous transaction." (*Ibid*.) In *Wilkins*, this discussion evidently led the trial court to conclude, erroneously, that the escape rule was not relevant to felony-murder liability for a sole felon**.**

eliminate the applicability of the continuous transaction doctrine, or in any way call into question the long-settled principles that CALCRIM No. 549 described.

Under this reading of *Wilkins*, giving former CALCRIM No. 549—without a clarifying "escape rule" instruction—would be reversible error, but only in a case where the defendant claims with some basis in the evidence that the escape rule applies to establish a clear end-point to the predicate felony for purposes of ascribing increased culpability. No such claim has ever been made in this case. Nor could it be. Because Ali was not entitled to the benefit of the escape rule, we see no risk of juror confusion. He maintained "continuous physical control" over Biletnikoff, thereby jeopardizing his own safety, until at least that point at which he had disposed of her body, effectively precluding a finding that he reached a place of temporary safety prior to the completion of both the murder and the predicate robbery. (CALCRIM No. 3261; accord, *People v. Stankewitz*, *supra*, 51 Cal.3d at p. 101; *People v. Fields*, *supra*, 35 Cal.3d at pp. 337, 365–368; *People v. Carter*, *supra*, 19 Cal.App.4th at pp. 1251–1253.) That is presumably why he did not request an escape rule instruction at trial, and why on appeal he has not assigned as error the failure to give one sue sponte. He apparently recognizes that the circumstances that led to a reversal of the defendant's conviction in *Wilkins* were not present here.

Nevertheless, Ali contends former CALCRIM No. 549 had no application to the facts of this case because it "spells out the complicity aspect of a nonkiller's liability for felony murder." (See *Wilkins*, *supra*, 56 Cal.4th at pp. 342–343.) This argument relies upon and reiterates the comments made by the CALCRIM editors when they withdrew former CALCRIM No. 549 from the Fall 2013 edition of those pattern instructions. In their explanatory comments, the CALCRIM editors opined that *Wilkins* left the instruction with "limited usefulness" beyond the factual context in *Cavitt*, a case "in which a non-killer fled, leaving behind an accomplice who killed."[13] (CALCRIM,

---

[13] In response to *Wilkins*, and "[t]o avoid any potential confusion, the committee has deleted that instruction, and replaced it [with] appropriate bench note references." (CALCRIM, Introduction to Felony-Murder Series, *supra*, at p. 8.)

31

Introduction to Felony-Murder Series (Lexis Aug. 2013 Supp.) p. 8.) We think Ali reads too much into the withdrawal of former CALCRIM No. 549. We agree that multiple perpetrator cases and the complicity issues that often arise in them can present highly unusual circumstances in the law of felony murder—and thus that *Cavitt* must be read with close attention to its factual setting—but we do not agree that anything in *Wilkins* or *Cavitt* suggests that the continuous transaction principles embodied in former CALCRIM No. 549 are *exclusively* applicable in that setting.

In any event, we are not bound to defer to the explanatory comments accompanying the withdrawal of former CALCRIM No. 549 (*People v. McDonald* (2015) 238 Cal.App.4th 16, 26; *People v. Fiore*, *supra*, 227 Cal.App.4th at p. 1381), nor do we construe those comments as amounting to a concession that giving the former pattern instruction would be erroneous in every case that does not fall into a *Cavitt*-type scenario. That is not what the CALCRIM Committee said, in literal terms, and nothing in the language of former CALCRIM No. 549 indicated any such intended limitation. We conclude here that, when the escape rule is not at issue, former CALCRIM No. 549 correctly states factors that may be considered by the jury in determining whether a temporal nexus exists between the felony and the killing, that is, whether the felony and the fatal act were part of a continuous transaction. Former CALCRIM No. 549 still accurately states the law on the facts before us for a sole perpetrator who may have killed the victim at a time substantially after the felonious taking and distant from the site of the robbery.[14]

---

[14] Dr. Haddix had testified that Biletnikoff was alive when the T-shirt was placed around her neck and was ultimately killed by the application of the ligature, although both forms of strangulation contributed to her death. Ali testified that he wrapped the T-shirt around her neck in the parking lot at Cañada College some substantial time after he took her keys from her in his office. Thus, the evidence raised the question whether the felony-murder rule would apply if a juror found Ali intended to steal Biletnikoff's car when he manually strangled her in his office, but also found the final death-causing act had occurred at Cañada College.

*Wilkins* held there was no sua sponte duty to give an instruction elaborating upon the continuous transaction rule where, as here, the causal relationship (or logical nexus) between the felony and the homicidal act is not in issue. (*Wilkins*, *supra*, 56 Cal.4th at p. 347.) But it did not address whether such an instruction would be appropriate if used in the case of a sole felon-killer where, on one view of the evidence, there was a substantial time lapse between the completion of the elements of the felony and the fatal act, and the felon made no claim that he had escaped to a place of temporary safety. The Supreme Court expressly left that question open: "We express no opinion on whether CALCRIM No. 549 would be correct or complete when given in a case that did not raise an issue on the applicability of the escape rule." (*Wilkins*, *supra*, at p. 350, fn. 5.) In this case, the jury was given a continuous transaction instruction, but unlike *Wilkins*, there was no need for clarification with the addition of escape rule language. We think former CALCRIM No. 549 was correctly given in the circumstances presented here.

Even assuming for purposes of argument that former CALCRIM No. 549 should not have been given, we do not find its inclusion prejudicial. As quoted above, former CALCRIM No. 549 is nothing more than a list of seven factors, presented in objective fashion, that the jurors "may consider" in deciding whether a felony was part of "one continuous transaction" with the cause of death of a victim so as to determine whether the felony-murder rule applies. Ali does not explain why these were improper considerations for the jury or how he was prejudiced by allowing the jury to consider them, and we see no good argument to be made on those points. Indeed, instruction with former CALCRIM No. 549 was arguably more favorable to Ali than instruction on the escape rule would have been.[15] There was no prejudicial error in instruction.

_____

[15] The factors to be considered under former CALCRIM No. 549 included "whether the fatal act occurred after the felony but while the perpetrator continued to exercise control over the person who was the target of the felony." That factor clearly applied here, for there is no question that Ali had control over Biletnikoff up until the time of the fatal act, whether that act occurred in his office or in the parking lot of Cañada College. Under CALCRIM No. 3261, this alone would have precluded application of the escape rule. Any juror who believed Ali intended to steal Biletnikoff's car when he used

33

F.    *Unanimity Instruction*

In a supplemental brief, Ali argues that a unanimity instruction should have been given requiring the jury to unanimously decide whether the felony underlying the felony-murder theory was the robbery of the car keys or the car itself.  The People argue—as did the District Attorney at trial—that the force Ali used in strangling Biletnikoff constituted the "force or fear" element of robbery, and that he robbed her of both the keys and the car at the same time.  Their theory is that once Ali had the car keys in his unchallenged possession he had unobstructed access to Biletnikoff's car as well, and therefore had robbed her of the car, too, even though he did not take physical possession of the car until sometime later.  Under the People's theory, it seems to make no difference whether the jury believed he robbed her of the keys or the car, as both were accomplished through a single robbery.

"A unanimity instruction is required when a defendant commits more than one act which might constitute the charged crime.  'Thus, if the evidence shows more than one instance of the charged crime—"two or more discrete criminal events"—a unanimity instruction is required.' [¶] . . . If the evidence shows only one instance of the charged crime, no unanimity instruction need be given." (*People v. Coryell* (2003) 110 Cal.App.4th 1299, 1307, fn. omitted; see *People v. Perez* (1993) 21 Cal.App.4th 214, 223.)

"A requirement of jury unanimity typically applies to acts that could have been charged as separate offenses." (*People v. Beardslee* (1991) 53 Cal.3d 68, 92.)  As a general rule, unanimity instructions are not required for a jury finding on the underlying felony in a felony murder charge, even if several different felonies are alleged as the

_____

force to escape from his office with her keys, and who also believed the fatal act was the ligature strangulation in the parking lot, would have been compelled to apply a felony-murder rationale if CALCRIM No. 3261 had been given to define the end-point of the felony.  Under CALCRIM No. 549, on the other hand, exercise of control over the victim was but one factor to be considered in concluding whether the felony-murder rule would apply, and the jury was free to find the robbery and the killing were not part of a continuous transaction using the factors identified.

34

underlying felonies. (*People v. Lewis* (2001) 25 Cal.4th 610, 654 (*Lewis*).) In *Lewis*, the defendant was charged with felony murder based on two possible underlying felonies: burglary and robbery. (*Ibid.*) The jury was not instructed that it must unanimously decide whether he committed the robbery or the burglary in order to convict him of felony murder. (*Ibid.*) The killing had occurred when the defendant stepped into the open door of the victim's apartment, stabbed him in the neck, and then took his wallet and looked in it for cash, but finding none, dropped it. The defendant also took the victim's pocketknife and his gun. (*Id.* at p. 624.) He then had an altercation with the victim's wife, stabbing her as well, and threatening to shoot her unless she gave him money. (*Ibid.*) The wife crawled to her husband's side, retrieved his wallet, and gave defendant $250 she pulled from a secret compartment in the wallet. (*Ibid.*) Although the felony murder conviction could have been based on either robbery or burglary, the court did not give a unanimity instruction, and the Supreme Court held this was not error. (*Id.* at p. 654.)

If juror unanimity is not required when two different distinct felonies are alleged as the basis for a felony murder and either could have been considered the crime giving rise to a felony murder conviction, then surely unanimity is not required on the precise factual theory of guilt when the People claim a single offense (robbery) as the underlying felony. (See, e.g., *People v. Smith* (2014) 60 Cal.4th 603, 617–619 [defendant not entitled to unanimous verdict as to particular manner in which felony murder occurred]; *People v. Memro* (1995) 11 Cal.4th 786, 869–870 [same]; *People v. Pride* (1992) 3 Cal.4th 195, 250 [same].)

We also find Ali's argument unpersuasive because it turns on the assumption that the jury instructions left the jury free to find that the taking of the car after Biletnikoff's death, even if done as an afterthought, would have made the killing a robbery felony murder, a theory we reject. Ali argues that some jurors could have concluded he intended only to borrow Biletnikoff's car when he snatched her keys and only after he had killed her did he form the intent to take her car to Mexico to escape prosecution. That interpretation of the evidence is not unreasonable, but it does not require a unanimity

35

instruction for the simple reason that it would make Ali not guilty of felony murder at all, and the jury was so instructed. If Ali formed the intent to permanently deprive Biletnikoff of the car only after her death, then there was no robbery, and the jury could not, under the instructions given, have convicted him on a felony-murder theory.

A reasonable juror might have concluded, alternatively, that Ali did intend to deprive Biletnikoff of her keys and her car permanently, or at least as long as necessary to flee far enough away to avoid the consequences of his probation officer discovering he had failed a drug test, which potentially included imprisonment and deportation. On this reading of the evidence, Ali was desperate when he quarreled with Biletnikoff, desperate enough to declare an end to the relationship and take flight in his former girlfriend's car. At oral argument, Ali's counsel conceded that there are multiple interpretations of the evidence, and we think this is one of them. Whether Ali intended to deprive Biletnikoff permanently of her keys and her car before her death was a question of fact for the jury.

Based on the instructions given, however, a reasonable juror could have convicted Ali on a felony-murder theory based on the taking of Biletnikoff's car *only* if he or she believed Ali had already formed the intent to permanently deprive Biletnikoff of her car at the time he manually strangled her. Both attorneys told the jury the amount of force used to take the keys from her hand was insufficient to constitute robbery, and the District Attorney specifically argued the force required for robbery was the force used against Biletnikoff when she tried to prevent Ali from leaving his office. The court also instructed the jurors, if they concluded Ali did not form the intent to permanently deprive Biletnikoff of her car until after she was dead, Ali could not be convicted on a felony-murder theory. CALCRIM No. 540A told them, "The defendant must have intended to commit the felony of robbery before or at the time that he caused the death." And CALCRIM No. 1600 told them, "The perpetrator's intent to take the property must have been formed before or during the time he used force or fear." Therefore, if the jurors believed the interpretation of the evidence outlined by Ali on appeal, they could not have convicted him on a felony-murder theory.

36

## II.    The Rebuttal Testimony of Dr. Missett

### A.    *Factual Background and Positions of the Parties*

Next, Ali argues that Dr. Missett should not have been allowed to conduct a compelled mental health examination of him in connection with the doctor's proposed rebuttal testimony because the District Attorney's request for the examination was untimely under the pertinent discovery statute, and allowing the prosecution to present his rebuttal testimony about the examination amounted to a violation of due process.

For purposes of determining timeliness, the most significant date was December 6, 2011, when Ali filed a written motion seeking to admit Dr. Stewart's testimony under section 28 to establish a diminished actuality defense, which was actively litigated by both parties.[16]  The District Attorney requested "an evidentiary hearing prior to the testimony of or reference to the testimony of psychiatric or psychological witnesses."  On December 8, 2011, the court deferred ruling on Ali's motion to admit Dr. Stewart's testimony, but both the prosecutor and the judge commented that the issue had been discussed at length in chambers that morning.  On December 14, 2011, the issue was again discussed and the judge decided a hearing would be held under Evidence Code section 402 before ruling on the defense motion.  The District Attorney at that time indicated the hearing need not be conducted "before opening statement" and "it can be done in between cases."  "I'm not putting on psychiatric testimony in the case in chief so it's not going to be an issue there."  Defense counsel expressed no objection to the District Attorney's proposed timing of the hearing.

Suffice it to say, both parties anticipated at least as of early December 2011 that Ali's mental health would potentially be an issue at trial and they both knew the identities

---

[16] The District Attorney's position was not that Dr. Stewart should be precluded from testifying altogether, but rather that his testimony should be limited to opinions regarding "any mental disease, defect or disorder suffered by the defendant" on the date of the crime and the "characteristics or manifestations" of any such defect, in accordance with sections 25, 28 and 29.

of the expert witnesses to be called by the defense and the prosecution in rebuttal.[17]  Yet the District Attorney did not file his request for a compelled mental health examination until February 27, 2012, when the trial was well underway, after the prosecution had rested and the defense had begun presenting its case, but before the court had ruled on the defense motion to allow Dr. Stewart's testimony.

Defense counsel argued the District Attorney's motion was untimely under section 1054.3 because a defendant places his mental state "in issue" "by notifying the District Attorney of the likelihood of a psychiatric defense."  He also objected on due process grounds because "not having that examination held until after my psychiatrist testifies, puts us at a disadvantage."

The District Attorney explained he had postponed making the motion because defense counsel had argued at a previous point in the trial that Ali was protected by the Fifth Amendment unless and until he testified at trial.[18]  Defense counsel admitted he earlier had been mistaken about the Fifth Amendment analysis and admitted his opposition might seem "disingenuous" as a result of now changing position.[19]  The court commented that it viewed the defense attorney's shifting positions as "kind of a catch 22."

---

[17] Dr. Stewart's name also appeared on Ali's witness list on December 30, 2011. Drs. Stewart and Missett were both listed as witnesses on the jury questionnaire, filed on January 9, 2012.  The defense indicated in opening statement on January 25, 2012, that Ali's mental state was in issue.  And on February 6, 2012, the prosecutor filed proposed jury instructions, including CALCRIM No. 3428, which covers a mental impairment defense.

[18] Defense counsel acknowledged that he "did argue initially that motion of the examination cannot be held if the defendant testifies."  We construe his remark to mean that such examination could not be ordered "*unless* the defendant testifies."

[19] The defendant's decision to testify or not to testify plays no role in the analysis. The defendant waives his or her Fifth Amendment rights simply by "tender[ing] his or her mental state as a guilt or penalty issue," thereby waiving "the Fifth Amendment privilege against self-incrimination, and the Sixth Amendment right to counsel, ' "to the extent  necessary to permit a proper examination of that condition." ' " (*Maldonado v. Superior Court* (2012) 53 Cal.4th 1112, 1116–1117 (*Maldonado*).)

When it became clear that the court was going to grant the prosecutor's motion, defense counsel requested that Dr. Missett's examination of Ali be conducted before Dr. Stewart testified and that the defense be provided with Dr. Missett's "proposed testimony and the nature of the conclusion" before he testified. Instead the court suggested, "The simple answer to that, I suppose, is that Doctor Stewart could come back and testify after Doctor Missett, assuming he does." This solution, we agree, prevented any kind of fundamental unfairness such as would have amounted to a due process violation. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 696-697 [due process violation in evidentiary issues requires showing of fundamental unfairness]; *People v. McKinnon* (2011) 52 Cal.4th 610, 668 [defendant's burden to show prejudice from discovery delay].)

The prosecutor's motion was granted without postponing Dr. Stewart's testimony. Consequently Dr. Stewart testified before Dr. Missett examined Ali, and Ali testified on direct and was partially cross-examined before the mental health examination.[20]

Ali argues the defense had put his mental state "in issue" within the meaning of the statute no later than December 6, 2011, when he made his motion to admit Dr. Stewart's mental state testimony under section 28. Given the late stage request for a mental health examination, Ali contends the court not only violated section 1054.3 by granting an *untimely* request, but violated his rights to a fair trial and due process by allowing the examination to go forward and Dr. Missett to testify about it. Ali acknowledges that the abuse of discretion standard of review applies. (*People v. Ayala* (2000) 23 Cal.4th 225, 299; *People v. Lamb* (2006) 136 Cal.App.4th 575, 581.) The Attorney General argues that the court's ruling was not erroneous, but even if the request is deemed to have been untimely, there was no prejudice to Ali because the defense had the opportunity to recall Dr. Stewart in surrebuttal.

---

[20] Dr. Stewart testified for the defense beginning immediately after the prosecution's motion was granted, and he concluded his testimony on February 29. Dr. Missett examined Ali for four hours on March 2, 2012, at the end of one of the days of Ali's testimony, after cross-examination had begun.

39

We agree with Ali that the District Attorney's request was not asserted at the time anticipated under the statute, but we do not find the court abused its discretion in finding the motion timely under all of the circumstances. Moreover, precluding Dr. Missett's testimony would not have been an appropriate remedy.

B. *The Law Relating to Compelled Mental Examinations by a Prosecutor's Expert*

Section 1054.3, subdivision (b) reads in relevant part as follows: "(b)(1) Unless otherwise specifically addressed by an existing provision of law, whenever a defendant in a criminal action or a minor in a juvenile proceeding brought pursuant to a petition alleging the juvenile to be within Section 602 of the Welfare and Institutions Code places in issue his or her mental state at any phase of the criminal action or juvenile proceeding through the proposed testimony of any mental health expert, upon timely request by the prosecution, the court may order that the defendant or juvenile submit to examination by a prosecution-retained mental health expert. [¶] . . . [¶] (2) The purpose of this subdivision is to respond to *Verdin v. Superior Court* 43 Cal.4th 1096, which held that only the Legislature may authorize a court to order the appointment of a prosecution mental health expert when a defendant has placed his or her mental state at issue in a criminal case or juvenile proceeding pursuant to Section 602 of the Welfare and Institutions Code. Other than authorizing the court to order testing by prosecution-retained mental health experts in response to *Verdin v. Superior Court*, *supra*, it is not the intent of the Legislature to disturb, in any way, the remaining body of case law governing the procedural or substantive law that controls the administration of these tests or the admission of the results of these tests into evidence." Having been added in 2009 in response to *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, the new subdivision was effective January 1, 2010, and there had been little case law construing it at the time of Ali's second trial.

The District Attorney below argued that Ali's mental state was not "place[d] in issue" until Dr. Stewart actually testified, an argument that the Attorney General seems to subscribe to on appeal. We find this position untenable. Section 1054.3 refers to placing

40

the defendant's mental state in issue "through the *proposed* testimony of any mental health expert," which in and of itself suggests the matter is placed in issue *before* the expert's actual testimony commences.  (§ 1054.3, subd. (b)(1), italics added.)  But especially in light of the Supreme Court's decision in *Maldonado, supra,* 53 Cal.4th at page 1129, which was decided after the trial in this case, we conclude the People's argument lacks merit.

*Maldonado* held "neither the Fifth Amendment right against self-incrimination, nor prophylactic concerns about the protection of that right, justify precluding the prosecution from full pretrial access to the results of mental examinations by prosecution experts conducted, pursuant to section 1054.3(b)(1), for the purpose of obtaining evidence to rebut a mental-state defense the defendant *has indicated he or she intends to present* on the issue of guilt."  (*Maldonado*, *supra*, 53 Cal.4th at p. 1141, italics added.)  The Supreme Court clearly rejected the view that a "timely" motion by the prosecution must await the actual presentation of mental state expert testimony by the defense.  In so holding, *Maldonado* rejected the notion that the defendant retains his Fifth Amendment privilege until he actually presents an expert's testimony on his mental health.  (*Id*. at pp. 1126–1127.)  The Fifth Amendment concern is addressed by prohibiting introduction of the results of such an examination if the defendant ultimately elects not to raise the issue at trial.  (*Id*. at pp. 1132–1133.)  Thus, we concur with Ali in his current assertion that he placed his mental state in issue as of December 6, 2011.

There can be no doubt the District Attorney had the opportunity to make his motion long before he actually did, and that certainly would have been a fairer and preferable approach to trial.  If he was not convinced Ali's mental state was "in issue" by the defense motion to allow Dr. Stewart's testimony or by inclusion of Dr. Stewart's name on defendant's witness list, then surely by the time of defense counsel's opening statement on January 25, 2012, he must have known Ali's mental health was in issue.  Given the foregoing indicators that the defense intended to present mental health testimony, the District Attorney's hesitancy to request the examination earlier appears to

41

have been unfounded and could legitimately be called unreasonable, except for the fluctuating positions taken by defense counsel at trial, which tempers our view.

C. *Defense Counsel's Fluctuating Interpretation of Section 1054.3 and the Fifth Amendment*

Ali's counsel clearly had a hand in creating the misunderstanding of the law that led to the arguably belated motion. Ali's position on appeal appears to be quite distinct from that initially taken by him in the trial court. In fact, defense counsel admitted his argument that the prosecutor's motion was untimely might "appear[] somewhat disingenuous" in light of his earlier position.

The court then attempted to summarize defense counsel's position: "clearly, what I'm coming to understand is the motion cannot be made until the defendant decides whether he's going to testify. I assume he's testifying?" The court evidently did not understand that defense counsel was changing his position. The defense attorney responded, "That's not the law as far as I can tell. [¶] . . . [¶] . . . [T]hat was my initial position. That is not supported by the case law either by California Courts or by the United States Supreme Court. Once he places at issue by notifying the District Attorney of the likelihood of a psychiatric defense, he has already placed it in issue . . . . [T]hen he no longer has a Fifth Amendment privilege."

After further discussion, the court summarized: "Okay. Well, all right. Again, I don't want to belabor this situation, but it seems to me just looking at the statute again and the fact that defense has indicated the defendant is going to testify, his mental state is at issue. There are various safeguards that can be put in place and it seems to be—again, backing up—that if need be, Doctor Stewart could testify after Doctor Missett, if Doctor Missett testifies. But again, we don't want to have this thing go on forever. I think with those . . . safeguards, the Court will grant the request."

When defense counsel again asserted the prosecutor's motion was late, the court commented, "You would have argued [against it] if he brought it before. Let's just get real here." Defense counsel responded, "If I'd researched it as I now have, I would have

42

realized that my off-the-cuff belief within that privilege was not well taken. I now believe my position is well taken."

Thus, defense counsel reversed positions on this issue, induced the prosecutor to delay bringing his motion, and confounded the court. Yet he now tries to establish error on appeal because the court granted the prosecutor's mid-trial motion. The District Attorney told the court "my only concern here is I tried to follow with what the defense has said; no, we don't want it so I held [off making the motion] to eliminate an issue and that's where I am." [21] We do not condone the District Attorney's reliance on defense counsel's misguided legal analysis, for surely the prosecutor had a duty to conduct his own research. Still, neither can we overlook defense counsel's role in creating the confusion.

D.    *Principles Underlying Doctrines of Invited Error and Judicial Estoppel*

Although the parties have not briefed the invited error doctrine, we think consideration of that doctrine and of judicial estoppel are appropriate in these circumstances. Although we do not apply those doctrines in full force, we believe the policies they represent may properly be taken into account in assessing the timeliness of the prosecutor's discovery motion. The purpose of the invited error doctrine is to avoid allowing a party to take one position to his tactical advantage at trial, and then allowing him to appeal the very ruling that he sought and secured below. (*People v. Perez* (1979) 23 Cal.3d 545, 549, fn. 3 ["The doctrine of invited error applies to estop a party from asserting an error when 'his own conduct induces the commission of error.' "].) The principle of invited error also prevents a party from taking a litigation strategy which "induces the commission of an error." (*Redevelopment Agency v. City of Berkeley* (1978)

---

[21] In an apparent reference to his previous *Wheeler-Batson* error, the District Attorney explained the timing of the motion: "one of my primary goals in this retrial is to avoid another error and I have, at times, been arguing cautiously for matters because I do not want to see any Appellate Court to find any basis for error in what you rule in this case, your Honor, which was the reason that I made the decision to not seek this examination until after the defense had formally put it at issue with the testimony of Doctor Stewart."

80 Cal.App.3d 158, 166.)  If he does, he is "estopped from asserting it as grounds for reversal."  (*Ibid.*)

It has sometimes been suggested that a position taken at trial in ignorance or from a mistake of law will not result in application of the invited error doctrine.  (*People v. Bradford* (1997) 14 Cal.4th 1005, 1057; *People v. Wickersham* (1982) 32 Cal.3d 307, 330.)  Such cases generally involve the mere acquiescence of defense counsel in an erroneous action by the court, where it is not possible to tell whether counsel was acting for a tactical reason.

But the Supreme Court has taken the opposite view, so long as counsel was motivated by a "clearly implied tactical purpose."  (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49.)  The record need only show that counsel made a conscious and deliberate tactical choice that led the court to make a ruling that the defendant then seeks to challenge on appeal.  (*People v. Cooper* (1991) 53 Cal.3d 771, 831.)  "If . . . the record shows this conscious choice, it need not additionally show counsel correctly understood all the legal implications of the tactical choice.  Error is invited if counsel made a conscious tactical choice.  A claim that the tactical choice was uninformed or otherwise incompetent must, like any such claim, be treated as one of ineffective assistance of counsel."  (*Ibid.*)

We find reason here to conclude that defense counsel took the position he initially took on section 1054.3, subdivision (b) as a matter of tactics.  Defense counsel was confronted with what he evidently perceived to be, rightly or wrongly, Ali's Fifth Amendment right to avoid a pretrial compelled mental examination, pitted against his due process right to early discovery of the prosecution's intended rebuttal.  Defense counsel evidently concluded that delaying Ali's mental examination by the prosecution's expert was more important than obtaining a preview of the prosecution's rebuttal evidence.  In making that tactical decision he appears to have led the court to an erroneous

understanding of what event would trigger the prosecution's right to such an examination and what the appropriate timing of such a motion would be.[22]

Similarly, under the doctrine of judicial estoppel, a party may be precluded " ' "from changing its position over the course of judicial proceedings when such positional changes have an adverse impact on the judicial process." ' " (*International Engine Parts, Inc. v. Feddersen & Co.* (1998) 64 Cal.App.4th 345, 350.) " ' "Judicial estoppel is 'intended to protect against a litigant "playing fast and loose with the courts." ' " ' " (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 181.)

We do not presume defense counsel acted in bad faith or intended to "play fast and loose" with the court, but by the same token, his mistaken view of the law does not change the fact that he gained a tactical advantage from the position he first asserted, and then tried to gain an even greater tactical advantage (eliminating the state's ability to contest his expert's opinion) by asserting the opposite position thereafter. In the final analysis we conclude that, regardless whether these doctrines are strictly applicable, their underlying purposes could properly be taken into account by the trial court in deciding whether the prosecutor's request for a mental examination of the defendant was "timely" within the meaning of section 1054.3, subdivision (b), which is in essence how we read what happened here.

---

[22] Ali argues that because the judge remained under a misapprehension of what the law requires for a defendant to put his mental state "in issue," the judge's ruling was automatically an abuse of discretion. We disagree that the judge was so fundamentally confused about the law that she was unable to make a reasoned decision within the scope of her discretion. Timeliness, as we here hold, involves the consideration of the "totality of the circumstances," including but not limited to the time at which the right to request a hearing arose. The judge had to weigh the defendant's asserted Fifth Amendment rights (as to which he changed his position mid-trial) against the right of the District Attorney to have his expert examine Ali. This basic calculus was not rendered invalid by the court's apparent misunderstanding of the event that triggered the prosecutor's right to file his motion.

E.    *Timeliness of the District Attorney's Motion*

Ali relies upon section 1054.7 to argue the District Attorney's motion was untimely as a matter of law. That section requires both parties to make discovery "disclosures" "at least 30 days prior to the trial," except upon a showing of good cause, which is specially defined.[23] Among the items subject to discovery by the defense under section 1054.1 are "statements of all defendants" (§ 1054.1, subd. (b)) and "any reports or statements of experts made in conjunction with the case, including the results of physical or mental examinations . . . " (§ 1054.1, subd. (f)). Ali appears to deduce from these provisions that a prosecutor must request a mental examination of the defendant even earlier in order to comply with his disclosure requirements under the 30-day rule. Ali thus asserts the District Attorney violated the statute by making his request mid-trial.

But the question of timeliness of a discovery motion—even one made after trial commences—has traditionally been entrusted to the discretion of the trial court. (See *City of Alhambra v. Superior Court* (1988) 205 Cal.App.3d 1118, 1132, 1135–1136; *id.* at pp. 1138–1139 (conc. opn. of Danielson, J.).) Trial courts are invested with broad inherent discretion in discovery matters, with criminal discovery—including mental health examinations of the defendant—historically being nonstatutory and within the court's judicially-bounded discretion. (See, e.g., *People v. Carpenter* (1997) 15 Cal.4th 312, 412; *People v. McPeters* (1992) 2 Cal.4th 1148, 1190; *Hill v. Superior Court of Los Angeles County* (1974) 10 Cal.3d 812, 816–817 & fn. 3; *People v. Danis* (1973) 31 Cal.App.3d 782, 786–787.) After adoption of Proposition 115 in 1990, the courts' power to order discovery in a criminal case became restricted to those subject matters covered by the discovery statutes. (*Verdin v. Superior Court*, *supra*, 43 Cal.4th at p. 1106; see § 1054, subd. (e).) The question we face is whether, by requiring a "timely" motion by the prosecutor under section 1054.3, subdivision (b), the Legislature intended to eliminate the trial court's discretion to grant such a motion mid-trial. We conclude the trial court

[23] Section 1054.7 provides, in part: " 'Good cause' is limited to threats or possible danger to the safety of a victim or witness, possible loss or destruction of evidence, or possible compromise of other investigations by law enforcement."

46

retains discretion to determine a prosecutor's motion for a compelled mental examination of a criminal defendant is timely, even if made mid-trial.

Specifically, we do not agree with Ali that the timeliness issue is governed by section 1054.7, which requires generally that discovery "disclosures required under this chapter shall be made at least 30 days prior to the trial . . . ."[24]  Because the request for a mental health examination does not constitute a "disclosure" required under the statutes, the 30-days-before-trial rule of section 1054.7 does not apply directly in this circumstance.[25]  Nor does Ali convince us that rule applies indirectly.  The Legislature said within section 1054.3, subdivision (b) itself that it did not intend to "disturb, in any way, the remaining body of case law governing the procedural or substantive law that controls the administration of these tests or the admission of the results of these tests into evidence."  This supports our conclusion that it meant to leave undisturbed the wide scope of a trial court's discretion in determining the timeliness of a motion under the new subdivision.

*In re Joseph H.* (2015) 237 Cal.App.4th 517, 537, recently construed the word "timely" in section 1054.3 to mean "at the earliest time possible."  In that case, the Fourth Appellate District, Division Two, held the trial court did not abuse its discretion in granting a mid-trial request by the prosecution to conduct a mental health examination of

---

[24] For the same reason we reject Ali's argument there was no "good cause" for the prosecutor's delay under the strict definition of "good cause" in section 1054.7.  Because the judge treated the motion as timely, there was no need for her to consider good cause for a late filing and no indication in the record she did.

[25] The commentators also have not construed the timeliness requirement of section 1054.3, subdivision (b) to be governed by section 1054.7.  "Section 1054.3 does not define 'timely request,' but the phrase has been defined, in the context of a defendant's request to compel a pre-trial line-up, to mean 'as soon . . . as practicable' after learning that the defendant's mental state is at issue."  (Hoffstadt, California Criminal Discovery (5th ed. 2015) § 2.04, p. 21.)  The 2014 supplement of that publication goes into greater detail:  "The determination whether a request is timely made is fact specific.  We anticipate that the courts will construe the language *timely request* sensibly, so that a request will be considered timely when it is made within a time frame that is reasonable under all of the facts and circumstances of the case."  (Pipes & Gagen, California Criminal Discovery (4th ed. 2014 Supp.) § 5.8, p. 444.)

the minor defendant after the defense objected to the testimony of a court-appointed expert who initially was appointed to conduct both the capacity and insanity examinations, in part because the timing of defense counsel's objection influenced the timing of the prosecutor's request. (*Id.* at pp. 535–538.) Thus, the case suggests the decision on timeliness may properly take account of the conduct and tactics of the defense. We agree with the test announced in *In re Joseph H.*, but emphasize that an appellate court should apply the "earliest time possible" standard in light of the totality of the circumstances, giving great deference to the trial court's decision. (See fn. 25, *ante*.)

Applying that test, the court did not abuse its discretion in considering the prosecutor's request timely. The court had evidently been misled by defense counsel into thinking the defendant must waive his Fifth Amendment privilege by testifying at trial before a motion for a compelled mental examination could be granted, or at least that a defense mental health expert had to testify before the defendant could be subjected to a compelled examination. The prosecutor could have, perhaps should have, straightened out the court and defense counsel about the actual meaning of the statute. Instead he delayed seeking the mental examination to avoid having to take a stand on interpreting a newly enacted law with constitutional implications. While not entirely justifiable, his delay was understandable, given all the circumstances. The trial court, too, apparently believed defense counsel himself was largely responsible for the delayed request. And any disadvantage imposed on Ali had to be weighed against the extreme prejudice the prosecution would have suffered if it had been given no access to Ali for purposes of rebutting the defendant's own mental state evidence. (See *Kansas v. Cheever* (2013) 571 U.S. ___, 134 S.Ct. 596, 601–603 [state must be allowed to produce psychiatric testimony of results of prior compelled mental health examination of defendant as rebuttal evidence if defendant produces expert testimony that he lacked the required mental state].) In light of that drastic consequence, we find the court did not abuse its discretion in granting the prosecutor's request for a mental evaluation of Ali and find no error, constitutional or otherwise, in allowing Dr. Missett to testify.

In any case, the court's ruling on the timing of prosecutor's motion was an error of statutory dimension only, and even if erroneous, was not prejudicial. (*Watson*, *supra*, 46 Cal.2d at p. 824.) The defense could not legitimately claim to be surprised that the District Attorney wanted to present a rebuttal expert; the expert who actually testified was named as a potential witness on the jury questionnaire. Dr. Stewart was allowed to observe Dr. Missett's interview with Ali and was allowed to offer surrebuttal testimony to counteract Dr. Missett's testimony. In light of these remedial measures, the timing of Dr. Missett's examination did not prejudice the defense. Nor do we think exclusion of Dr. Missett's testimony would have been an appropriate remedy, even if the prosecutor's motion were deemed untimely. The trial court could properly treat exclusion of Dr. Missett's testimony as a last resort in dealing with the mid-trial request.[26]

## III. Prosecutorial Misconduct in Cross-examination and Argument

### A. *Ali's Contentions*

Ali's appellate counsel has been quite critical of the District Attorney in this case because, as he claimed in oral argument, the District Attorney was so determined to get a first degree murder conviction in this high profile case[27] that he bent the rules of fair advocacy to ensure that result. For instance, after reminding the jury that there were two "roads" to a first degree murder conviction, the felony-murder theory and the premeditated deliberate murder theory, the District Attorney argued to the jury in his rebuttal, "I suggest to you the evidence shows that both roads are clear, but this one [felony murder] it's—you know what, it's the super highway and straight to that destination." Ali's counsel suggested this line of argument encouraged the jury to ignore Ali's evidence, particularly on the issue of mental state, and to take a short-cut to a first degree murder verdict. Ali's counsel returned to the "super highway" theme again and

---

[26] See section 1054.5, which authorizes sanctions for violation of criminal discovery statutes, provides in part: "The court may prohibit the testimony of a witness pursuant to subdivision (b) only if all other sanctions have been exhausted." (§ 1054.5, subd. (c).)

[27] Biletnikoff was the daughter of a Bay Area Hall of Fame football hero of nationwide renown.

again in oral argument as a reminder of the prosecutor's alleged overzealousness and its supposed impact on the verdict.

Preliminary to our resolution of the prosecutorial misconduct claim, we remind counsel that we do not lightly impute to an attorney ill motives. More importantly, if the jury was properly instructed, as we have found, we indulge a strong presumption that the jury followed the instructions given by the court, especially where "that presumption is supported by the actual, deliberative conduct of the . . . jury." (*People v. Williams* (2015) 61 Cal.4th 1244, 1279.) In this case the jury deliberated for approximately nine hours before reaching a verdict, and it sent three notes to the court during deliberations, including one requesting clarification of the robbery instruction (i.e., the meaning of the requirement that a defendant must have intended to permanently deprive or to "remove [the property] from the owner's possession for so extended a period of time" as to diminish its value or enjoyment). The jury wondered, "If an individual took keys against that person's will, if the individual returned the keys within one hour, would that individual have committed robbery?" This note suggests the jury was deliberating on the felony-murder theory in light of the very argument that Ali makes on appeal: that he intended only to borrow Biletnikoff's car when he took the keys. Thus, the note tends to refute any suggestion that the jury ignored Ali's evidence, rushed to judgment, took the "super highway" to a first degree murder conviction, or otherwise acted improperly in response to the prosecutor's trial tactics. The jury also sent a note requesting to clarify what proper use could be made of an individual juror's notes, which suggests the jury took its ethical obligations seriously. Given these several indications in the record and the strong presumption that the jury followed its instructions, we cannot conclude that any error by the prosecutor, assuming for argument's sake there was error, affected the jury's conduct or its verdict.

Addressing Ali's specific allegations of prosecutorial misconduct, he first contends "[t]he prosecutor denied [him] due process and a fair trial when he questioned Ali about his failure to tell anyone about various aspects of the case before his testimony." Specifically, Ali claims the District Attorney improperly inquired into Ali's

50

failure to disclose before his second trial the following details about the crime when he talked with his family, law enforcement, and Dr. Stewart about this case: (1) Ali had never told anyone about posing Biletnikoff's body to make it look like she had been the victim of a sex crime; (2) he had never told anyone he had confessed to Biletnikoff that he relapsed with both drugs and alcohol, not just alcohol; (3) he had never told anyone he planned to go to Mexico City to visit a friend when he fled; (4) he had never told anyone Biletnikoff's head hit the back of the van when he unloaded her body at Cañada College; and (5) he failed to disclose the foregoing details of the crime for the entire 13 years since Biletnikoff's death.

In addition to challenging those specific aspects of cross-examination, Ali contends the District Attorney committed the same sort of misconduct in closing argument by suggesting the jury should reject Ali's testimony about the events altogether because he included new details not before mentioned to anyone, and that they should reject his mental defense because it was never disclosed before Dr. Stewart's testimony at the second trial.

Ali claims the foregoing questions and comments were constitutional error because they amounted to improper references to his failure to testify at the first trial, in violation of *Griffin v. California* (1965) 380 U.S. 609, 615 (*Griffin*), and amounted to improper comment on his post-*Miranda* silence, in violation of *Doyle v. Ohio* (1976) 426 U.S. 610 (*Doyle*). Ali further contends the prosecutor asked him cross-examination questions that violated his attorney-client privilege, and together with certain of the prosecutor's comments in closing argument, amounted to a "direct[] attack[]" on Ali's Sixth Amendment right to counsel. He concludes the prosecutor's conduct violated the federal Constitution and requires reversal because the People cannot establish the misconduct was harmless beyond a reasonable doubt. (*Chapman*, *supra*, 386 U.S. at pp. 23–24.)

Ali further contends the District Attorney committed prejudicial misconduct in two respects in closing argument while discussing the testimony of the experts. At one point during rebuttal argument the District Attorney suggested it was "nonsensical" for

51

the defense to criticize him for failing to recall Dr. Haddix to respond to Dr. Spitz's testimony about the cause of death, whether by ligature or manual strangulation: "Should I bring her back to repeat the same thing that she said . . . ? . . . And then he could have brought Doctor Spitz back and I could bring Doctor Haddix back and eventually the Judge would need to be a referee who would say stop type of a thing." Ali claims the District Attorney's argument amounted to misconduct because it "invit[ed] the jury to speculate about evidence never presented at trial, allow[ed] the prosecutor to testify, to improperly supply the jury with facts not in the record, and to offer unsworn testimony not subject to cross-examination." The gist of his complaint, we gather, is that the jury was invited to assume Dr. Haddix, in response to Dr. Spitz's opinion, would not have changed her opinion or acknowledged error and would have defended her original opinion.

And finally, the District Attorney referred to the fact that Dr. Missett had spent only four hours with Ali, specifically that he "wasn't allowed the opportunity to spend 17 hours with him" as Dr. Stewart had been. Ali cites this line of argument as error on the basis that it implied either the defense or the court was to blame for Dr. Missett's limited access to Ali, whereas Ali lays the blame at the prosecutor's own feet.

B. *Ali's Prosecutorial Misconduct Claims Have Been Forfeited*

At no point in the trial did defense counsel ever object to the questions now challenged or the arguments now assigned as error on grounds of prosecutorial misconduct, nor did he request an admonition. Likewise, he never objected on *Doyle* or *Griffin* grounds to any prosecutorial question or statement and thereby forfeited those specific assignments of error. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1050–1051 [*Griffin*]; *People v. Tate* (2010) 49 Cal.4th 635, 691–692; *People v. Hughes* (2008) 27 Cal.4th 287, 332 [*Doyle*].) And though defense counsel did object twice on grounds that a question invaded the attorney-client privilege, the District Attorney each time rephrased the question to eliminate any potential communication with counsel. As to the specific questions and arguments claimed on appeal to be error, no claim of privilege was interjected. No objection on Sixth Amendment grounds was registered by defense

counsel.[28]  Consequently, all of Ali's arguments were forfeited.  (E.g., *People v. Wilson* (2008) 44 Cal.4th 758, 800; *People v. Ashmus* (1991) 54 Cal.3d 932, 976; *Benson*, *supra*, 52 Cal.3d at p. 794.)

        C.        *Defense Counsel's Failure to Object Did Not Prejudice Ali*

Anticipating our conclusion that he had forfeited any prosecutorial misconduct claims, Ali also contends he was deprived of the effective assistance of counsel by his attorney's failure to object to the alleged misconduct.  (See *Strickland v. Washington* (1984) 466 U.S. 668 (*Strickland*).)  We have been cautioned by the Supreme Court that a defendant cannot resurrect a forfeited claim simply by cloaking it in the garb of ineffective assistance of counsel.  (*People v. Thompson* (2010) 49 Cal.4th 79, 121, fn. 14.)  And of course, to show ineffective assistance of counsel, a defendant must make the familiar two-prong showing of both deficient performance and prejudice.  (*Strickland*, *supra*, at p. 687.)  To establish deficient performance under *Strickland*, a defendant must show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  (*Ibid.*)  On the performance prong, " 'deciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.' "  (*People v. Romero and Self* (2015) 62 Cal.4th 1, 25.)

But without addressing the performance prong further, we reject Ali's ineffective assistance of counsel claim on the basis that the claimed errors were not prejudicial.  *Strickland* authorizes us to proceed directly to the prejudice prong: "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, … that course should be followed."  (*Strickland*, *supra*, 466 U.S. at p. 697.)  In order to establish prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  (*Id*. at p. 694.)  A defendant "need not show that counsel's deficient conduct more likely than not altered the outcome in the case."  (*Id*. at p. 693.)  Rather, he must show "a

---

[28] Ali's opening brief claims he asserted Sixth Amendment objections twice, but the objections were actually on grounds of attorney-client privilege.

probability sufficient to undermine confidence in the outcome." (*Id*. at p. 694.)  We conclude Ali fails to meet the *Strickland* standard of prejudice.  In fact, the alleged misconduct in the aggregate had no likely effect on the jury's verdict, and so counsel's failure to object cannot have been prejudicial.

Underlying Ali's claims of *Griffin* and *Doyle* error, Fifth, Sixth, and Fourteenth Amendment violations, and invasion of the attorney client privilege, is the complaint that the District Attorney's cross-examination focused the jury on Ali's supposed lies by omission, thereby undermining his defense.  But the prosecutor's attempt to portray Ali as a liar based on failure to disclose the specific details on which the prosecutor focused in his cross-examination must have fallen flat.  The omitted details were so inconsequential that no reasonable juror would have rejected the whole of Ali's testimony (which was largely consistent with the other evidence) or the mental defense he put forth simply because those details were disclosed for the first time in his and Dr. Stewart's trial testimony.

First of all, Ali's failure to disclose further details of the offense was largely explained by his own testimony that his attorney had told him "not to say nothing to nobody."  It is unlikely the jury would have faulted Ali for following his attorney's advice.  Moreover, none of the specific facts that Ali was cross-examined about had much relevance to the jury's ultimate decision, nor were they major points of contention. The District Attorney apparently hoped by pointing out the omissions he would convince the jurors that Ali was untrustworthy and manipulative and lead them to reject Ali's testimony altogether.  But we seriously question to what degree the District Attorney's aim was achieved, since Ali successfully explained each omission and gave a global answer that his attorney had advised him not to talk about the case.  After reviewing the challenged examination and argument in context, we do not believe Ali's defense was damaged by the District Attorney's tangential and seemingly fruitless cross-examination and do not find it likely to have affected the jury's verdict on any issue of consequence.

Questions of the "why didn't you tell anyone before?" variety are useful in cross-examination because they may raise an inference that the witness's testimony is a recent

fabrication. (See, e.g., *People v. Riccardi* (2012) 54 Cal.4th 758, 803 [" '[R]ecent fabrication may be inferred when it is shown that a witness did not speak about an important matter at a time when it would have been natural for him to do so' "].) The District Attorney's questions about the sex-crime cover-up could not realistically have led to such an inference, however, because Ali's testimony was entirely consistent with the physical evidence. We see no basis to conclude anyone was fooled into thinking Ali had fabricated the sex-crime cover-up story, for the gardener who discovered Biletnikoff's body and the law enforcement officers who responded to the Cañada College dump site confirmed that her body had been arranged to look as if she had been the victim of a sex crime.

Moreover, to carry much weight such a question must inquire about "important" matters that one would be expected to divulge. (*People v. Riccardi*, *supra*, 54 Cal.4th at p. 803.) Whether Ali told Biletnikoff he had relapsed on drugs and alcohol or only on alcohol, and whether or not Ali had a friend in Mexico City, seem not to be such important details. It was very apparent from the testimony of multiple witnesses that Ali had disclosed his relapse to Biletnikoff and they argued about it. Whether he made a full confession or a partial one is beside the point, as is the question and commentary about whether he actually had a friend in Mexico City that he intended to visit. He had told the detectives in 1999 that he bought a bus ticket to Mexico City and then got a refund for it. That much certainly was not a recent fabrication. Whether he was heading there blind or to visit a friend is an irrelevant detail, the omission of which could not reasonably reflect poorly on Ali's overall credibility. We find it highly doubtful the cross-examination and argument on these points made any real headway with the jury.

The only fact of any import at all about which the prosecutor inquired in the challenged aspects of his cross-examination was the bump on the back of Biletnikoff's head as Ali unloaded her body at Cañada College. Ali may have included this detail with the intention of explaining the injuries to Biletnikoff other than those from the strangulation, since in his 1999 interview and at trial he had consistently denied inflicting those additional injuries on her. The prosecutor's question may have encouraged the jury

to disbelieve Ali's bump-on-the-head explanation. But even granting that possibility, we conclude the cross-examination had no realistic possibility of affecting the verdict. Whether truthful or recently fabricated, Ali's testimony is not likely to have carried much weight with the jury in explaining the injuries to Biletnikoff's face or other parts of her body, about which Dr. Haddix testified. Therefore, the prosecutor's argument likely had no impact on the jury's resolution of any issue in the case, nor any meaningful impact on their assessment of Ali's overall credibility. Whatever the cross-examination was intended to achieve, we think it highly improbable the result of the trial would have been different without it.

Ali also appears to claim the prosecutor in closing argument insinuated that Dr. Stewart's testimony about Ali's mental state defense was a recent fabrication because it was a "new part . . . we have not heard before" and a "pretty significant point." This, too, was not prejudicial. First, we are not at all sure the jury would have understood this comment as an accusation that the bipolar diagnosis and mental state defense were manufactured for trial. It was clear from Dr. Stewart's own testimony that Ali's bipolar disorder had not been diagnosed at the time of the crime, nor at the time of his first trial. It was not diagnosed until he had been transferred to San Quentin to commence his prison term. Therefore, we think it highly unlikely the jury would have been persuaded to reject Dr. Stewart's testimony simply because no such defense had been presented at the first trial. Similarly, there is no reason why Ali's bipolar disorder would have been known to any of the other witnesses who testified at trial about the events that transpired in 1999, for Ali himself did not know of his disorder at that time. The prosecutor's suggestion that the defense was a recent fabrication—if that's what his comments amounted to—likely fell on deaf ears.

With respect to his comments relating to the testimony of the experts, we understand the District Attorney's first challenged comment simply as defending his decision not to recall Dr. Haddix, reasoning that at some point the battle of experts has to

cease.  As such, it was a fair response to defense counsel's preceding argument.[29]  We find it highly improbable the jury would have understood the District Attorney's remark as an invitation to speculate about unsworn and unpresented testimony, as Ali contends.

And finally, though it may have bordered on misconduct for the District Attorney to suggest it was someone's fault other than his own that Dr. Missett had a limited time to examine Ali, we do not believe the jury would have understood it that way.  The jury was unaware of the proceedings leading to the timing of Dr. Missett's examination of Ali and would have been unlikely to read into the prosecutor's rather mild remarks the meaning suggested by Ali on appeal.

In light of the entire evidence and arguments in the case, we believe there is no reasonable likelihood the outcome of the trial would have been different if defense counsel had objected to the prosecutor's conduct.  Our confidence in the outcome of the trial is not undermined.

## IV.    Cumulative Error

"Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial."  (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32; see *People v. Hill* (1998) 17 Cal.4th 800, 847 ["negative synergistic effect"].)  Here, Ali contends even if reversal is not required by any one of the previous alleged errors considered alone, reversal is required because of the cumulative impact of the errors.  We have hypothesized error on two minor instructional points (failure to grant the pinpoint instruction and giving CALCRIM No. 549), assessed prejudice from the timing of the prosecutor's motion for a mental examination, and assessed prejudice from the alleged ineffective assistance of counsel without addressing error.  Having set forth in

_____

[29] Defense counsel had argued:  "if you have any doubt as to Doctor Spitz's conclusion on the cause of death, remember that the prosecution did have the opportunity to recall Doctor Haddix. . . . [W]itnesses, even expert witnesses, can always be subpoenaed.  They can always be recalled back just like we recalled Doctor Stewart back following Doctor Missett.  And there's nothing more important than a murder trial and there's no excuse that if she has something more to say and didn't believe Doctor Spitz is accurate, she could have been called back as well."

detail our reasons for finding the individual assumed errors to be harmless, we also find they were not cumulatively prejudicial.

## DISPOSITION

The judgment is affirmed.

_____
Streeter, J.

We concur:


_____
Reardon, Acting P.J.


_____
Rivera, J.

A136128/*People v. Ali*

59